The opinion of the court was delivered by KOBLITZ, J.A.D.
KOBLITZ, J.A.D.
*913 *361 The New Jersey Division Of Child Protection and Permanency (Division),[3] and the Law Guardian on behalf of the two young children, appeal from the Family Part's June 30, 2016 order denying termination of parental rights following an extended eighteen-month trial at which twelve witnesses testified and hundreds of exhibits were admitted into evidence.[4] The trial judge *362 found that the Division did not provide reasonable services to the mother, who used a wheelchair. Considering our standard of review of a decision not to terminate parental rights, we affirm. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553, 90 A.3d 1258 (2014).[5]
This appeal involves the termination of parental rights of T.D., a mother suffering from multiple sclerosis (MS) and R.C., the father of her two youngest children, B.C. (Belle) and A.G. (Alice), born in 2012 and 2014, and removed from the care of their parents shortly after birth.[6] The trial judge found the Division failed to establish any of the four prongs required to terminate parental rights. N.J.S.A. 30:4C-15.1(a).
Although the trial judge may have erred in his analysis of the first two prongs of the four-prong best-interests-of-the-child test, the trial judge did not mistakenly conclude that the Division failed to establish, by clear and convincing evidence, the third and fourth prongs.
I.
Although no medical records were ever placed into evidence, T.D. was evidently diagnosed with MS in 2007 or 2008, when she was in her early thirties. She was confined to a wheelchair. We must set forth the Division's involvement with this family in some detail to fully explain our *914 decision. We include some of the history involving Mary, an older daughter not involved in this appeal, because it sheds light on the Division's failure to provide handicap-accessible services to T.D. *363 A.
The Division first became involved with T.D. in October 2008, just after her daughter Mary turned six. A Division investigation found Mary to be well-groomed and the family home, a three bedroom apartment, to be clean with working utilities. T.D. reported that she had a "nurse" come every day to assist with cooking and household tasks. The Division's assessment noted that T.D. had MS and "limited mobility" but that she was "caring for her children to the best of her ability," and it concluded that the allegation of neglect was unfounded.
A year later, Mary's paternal aunt called the Division to report concerns that Mary was not being cared for properly. The Division concluded that the allegations of neglect were unfounded, but noted T.D. "is wheelchair bound and relies on homemakers to do the house cleaning and cooking," and that she "cannot enforce the house rules and does not appear to have a strong hold on her children's behavior."[7]
Two months later, in January 2010, the paternal aunt again called the Division with concerns. The caseworker observed that the apartment had a bad odor, broken furniture, trash and dog feces on the floor, roaches on the kitchen counter top, and no food in the refrigerator. The Division worker saw an "empty whiskey bottle in the living room underneath a chair by the front window," which T.D. said belonged to her father. T.D. confirmed that a "home aide service provider" came daily.
The Division performed a Dodd removal,[8] placing Mary with her paternal aunt. The Division stated it would "[c]ontact the home *364 health aide to verify their involvement with the family." A Division worker acknowledged at trial that the deplorable condition of the home showed that the home health aide was not doing her job, but the Division did not address the issue or replace the provider with one of the other services used by the Division.
T.D. stipulated that her home had been in a deplorable condition rendering it unsafe and unfit for children to occupy. The court ordered her to (1) undergo psychological and substance abuse evaluations, (2) attend parenting skills training at Community Access, and (3) cooperate with homemaker services. The sole reason for ordering the substance abuse evaluation was the presence of the empty whiskey bottle in the apartment during the Division's visit.
At a later hearing in March 2010, Judge Spatola directed the Division to confirm that Community Access either had the ability to transport T.D., who used a wheelchair, to its office or to provide services in T.D.'s home. The judge stressed that handicap accessibility "is important." Judge Spatola noted that providing a "teaching homemaker" two days a week in addition to the existing daily home health aides "would be a good idea" because such a person would offer a different service than the existing caregivers and "might be able to assist [T.D.] in learning techniques *915 to help her." The Division did not follow up on this judicial suggestion.
Briana Cox, Psy.D., evaluated T.D. in April 2010. Dr. Cox noted that T.D. "may be caring for her children to the best of her ability, but that does not necessarily mean that she is meeting their needs." In particular, Dr. Cox raised concerns that T.D. (1) "demonstrated a tendency to deny or minimize" problems, (2) was "uncooperative with testing demands," (3) "appear[ed] to have little control of the children," (4) reported taking medication, including oxycodone, that could interfere with her ability to be alert and focused, and (5) had a serious medical condition that required her to have assistance with her own needs and made it "unlikely that she can meet the needs of her children."
*365 Dr. Cox concluded: "At this time, it does not appear that [T.D.] is capable of parenting independently." She made the following recommendations:
1. It is recommended that [the Division] obtain [T.D.]'s medical records and consult with her treating physician about her physical limitations and what she can be expected to do on her own.
2. It is recommended that a medical professional review her medications and advise [the Division] about the side effect of drugs such as oxycodone and the expected limitations on functioning as a result of using that, or other drugs.
3. It is recommended that [T.D.] have a substance abuse evaluation. It is recommended that her use of prescribed medication be investigated.
4. It is recommended that she complete parenting classes.
5. It is recommended that she participate in individual therapy to address the impact of MS on her psychological functioning and assist with adjustment. It is recommended that this therapy be provided in-home.
6. It is recommended that [the Division] investigate relative resources in order to provide [T.D.] with assistance in caring for her children on a regular basis.
7. It is recommended that [Mary] and [T.D.'s older son] participate in psychological evaluations to determine if they have any needs at this time.
8. It is recommended that home health aide services continue in the home.
9. It is recommended that [T.D.] maintain appropriate housing.
10. [T.D.] may benefit from a support group for individuals who have been diagnosed with MS.
11. It is recommended that [T.D.] be reevaluated in 6-12 months to determine if she has been able to benefit from services. It is recommended that [the Division] obtain records from her participation in services and provide the evaluator with those records at the time of the new evaluation.
Dr. Cox's trial testimony was consistent with her report. Dr. Cox testified that her "goal in this report" was to provide professional insight as to services "the Division should supply to [T.D.] to assist her in addressing anything that might exist to achieve reunification."
In September 2010, the Division was ordered to "obtain [T.D.]'s medical records for medical consult as to potential side effects and limitations of functions as it pertains to [T.D.]'s parenting." Medical records were not obtained.
T.D. participated in the court-ordered substance abuse treatment. Saint Michael's Medical Center reported that T.D. had been admitted into an outpatient substance abuse treatment program *366 meeting three *916 times per week. The results of T.D.'s urine screens and oral swabs were all negative, and the clinician reported that "[w]hen [T.D.] is in attendance, she actively participates in the program."
On December 3, 2010, the clinician wrote to the Division, stating that T.D. had been present for only one treatment after September 7, 2010, due to problems with transportation. She explained: "On numerous occasions the transportation service that was transporting [T.D.] to and from treatment failed to pick her up on time. Consequently, [T.D.] was left waiting for many hours until the van service could be contacted."
A few weeks later, the clinician advised the Division that T.D. had successfully completed her substance abuse treatment and was "being routinely discharged ... with a status of 'Completion'," noting that only a brief course of therapy was appropriate because T.D. had "barely met the requirement for a diagnosis due to a lack of substance use history."
A Division caseworker, who worked with the family beginning in March 2010, testified at a hearing in December 2010 that T.D.'s "excuse for not attending services" was lack of transportation. T.D. was approved for transportation services through Access Link by September 2010, and the worker advised T.D. that she should use that service for visits and to attend court-ordered services. In November 2010, T.D. informed the caseworker more than once that Access Link was not working for her "because they don't assist her getting out of her house and she has to wait a block from her house when she needs a ride." She also reported having difficulty with the fees charged. When the worker asked how T.D. was getting to substance abuse treatments at Saint Michael's without Access Link, T.D. said "that she was using Medicaid transportation services and she got away by telling them that she needed a ride for a medical appointment."
T.D. was referred to Family and Children's Services (FCS) for individual therapy, but she had transportation difficulties there as well. FCS agreed to provide transportation through a service *367 called "ON TIME." T.D. consistently attended both individual therapy and visitation with Mary at FCS when the ON TIME service was provided. During a status conference in April 2011, at which T.D. appeared telephonically, Division counsel noted that "since that has been arranged, [T.D.] has been consistent with visitation," but that "they can only do it biweekly."
At the April 2011 status conference, Division counsel stated that if T.D. "gets connected with Access Link and she can get to the [Division] office," she could have visitation on the weeks FCS did not cover. Counsel explained: "But we can't transport her. It's a liability issue. We have no ability to transport her ourselves." The Division attempted to schedule parenting skills classes for T.D. at FCS so that the same transportation could be provided, but FCS was not able to accommodate the request.
The issue of T.D.'s medical records was also raised. Division counsel stated that T.D. never provided the records; T.D. asserted that she was never asked to provide them. T.D. promised to cooperate by signing any form the Division needed to obtain records. The resulting order stated that the Division "shall obtain [T.D.]'s medical records for medical consult as to potential side effects and limitations of functions as it pertains to [T.D.]'s parenting." The Division did not obtain these records.
T.D.'s individual counseling and therapeutic visitation at FCS progressed well for several months. On May 25, 2011, FCS reported to the Division that T.D. "has been consistent in her attendance at therapy *917 sessions and has demonstrated motivation towards achieving her treatment plan goals."
On August 22, 2011, T.D.'s new therapist provided a generally favorable update. The therapist's "impressions" were:
[T.D.] is actively participating in her therapy sessions and is motivated to comply with services in order to obtain custody of her daughter [Mary]. She appears to be making strides towards improving her own life so that she can be more independent and subsequently be able to have her daughter back in her care.
FCS reported positively on the visitation sessions between T.D. and Mary that had taken place between the end of March and *368 early June 2011. T.D. continued successful bi-weekly therapeutic visits with Mary at FCS through the summer of 2011.
Alexander Iofin, M.D., conducted a psychiatric evaluation of T.D in February 2011. He believed incorrectly that T.D. had failed to complete her substance abuse treatment. Dr. Iofin noted that, due to T.D.'s MS, "it is unlikely that she can meet the needs of her children when she needs assistance to meet her own needs." He opined she has "psychiatric problems as a result of her significant neurological problems, primarily in the realm of multiple sclerosis." He concluded:
[A] letter from the treating neurologist with prediction of the course of multiple sclerosis, and specific data about treatment of multiple sclerosis, certainly will be helpful to consider, with necessity for the neurologist to comment on her functional limitations. If necessary this should be supported by data from an occupational therapist to have a better idea about the scope of functional limitations that certainly are in existence with [T.D.] right [sic], and it is unlikely to anticipate that these limitations will improve to any significant degree.
Dr. Iofin opined that T.D. "is only able to provide minimally adequate care for her children if she has external support and services provided to her on an ongoing basis." Dr. Iofin's trial testimony was consistent with his report, although he acknowledged he did not observe symptoms of any psychological disorder in T.D. during the forty-five to fifty minutes he spent with her.
At a hearing in October 2011, T.D. agreed to sign new medical releases. The Division did not follow up to secure the records.
B.
The father of the two little girls who are the focus of this appeal, R.C., testified at trial that he met T.D. in 2010 when they lived across the street from each other and helped her because she "was really bad off." In 2011, R.C. met Division caseworkers at the home, but did not "feel comfortable" telling them anything about himself because he was not involved in Mary's case and it was his "right as a human being and an American citizen" to refuse to provide information.
*369 In December 2011, T.D. and R.C. advised the Division that T.D. was pregnant with R.C.'s child. R.C. said he was not planning to reside with T.D. and would "not allow" the Division to take his baby. Two workers visited T.D.'s home the following day and spoke to T.D. and R.C. R.C. reportedly told one worker that he planned to raise the baby once it was born and would not cooperate with the Division. R.C. also said he believed the Division discriminated against T.D. because she was handicapped.
The worker testified that when she saw R.C. in person, he "would have mood *918 swings" and sometimes be very loud and "screaming." Another worker reported that R.C. "pointed at [T.D.] and said 'that one is mine, y'all ain't taking that one. I'm going to the chair for that one.' "
T.D. was successfully engaging in services. On January 4, 2012, FCS reported that T.D. had completed thirty-two therapy sessions with two therapists, making her "fairly consistent in her attendance." T.D. "has made progress toward her treatment goals and is increasingly more open to discussing challenges that she faces with her chronic medical condition," even though "[p]reviously she had denied that her illness impacted her ability to function independently." "She acknowledged that certain physical tasks are more difficult for her but seems to believe that she is capable of caring for her daughter [Mary] and has expressed that she feels that her friends and family would be able to provide her with adequate support as needed."
T.D. was also taking parenting classes. Her therapist reported that "although it was a challenge for her to obtain transportation and continues to be a challenge for her to travel with her medical condition, she is complying with the recommended service."
In early February 2012, however, FCS suspended services to T.D. solely because she "needed assistance with going to the restroom." Around the same time, R.C. provided his real name and date of birth. At the end of February 2012, T.D. called the Division to advise that she was in labor and Belle was later born at the hospital.
*370 The Division's concerns about R.C. at the time of Belle's birth included his "extensive [c]riminal [h]istory that includes endangering the welfare of a child and threatening to kill someone," a history of substance abuse and that he "declared in the presence of [a Division worker] that he would go to the 'electric chair for that one' when pointing to [T.D.]'s womb."
Although the Division visited T.D.'s apartment and reported that the apartment "appeared clean and neat," it initiated a Dodd removal of newborn Belle "based on mom's mental and medical health issues," R.C.'s "extensive criminal and [Division] history," "the lack of a paternity test proving [R.C. is] the father, and the conditions of the home ...." Human Services Police (HSP) officers went to the hospital, found Belle with both parents, and took custody of the infant. According to the Division, R.C. "stated that his threats were not physical, but that he will make sure that the people involved get fired."
R.C. testified that four or five HSP officers came with a worker to remove Belle and that one "extracted his revolver and told me not to move." R.C. believed that the Division's actions violated the law, which he understood to be that the Division "cannot take healthy newborn babies from parents who love and want their children for risk factors only."
The judge permitted T.D. weekly visits with Mary and Belle at the Division office, transported by R.C. Over the next few months, T.D. attended visits at the Division office. R.C. repeatedly telephoned the caseworkers, stressing that the Division had acted illegally, asking that Belle be returned, and making accusations of bias and conspiracy.
Over the next eleven months, T.D. and R.C. largely declined to participate in any services other than visitation, which occurred sporadically. R.C. was adamant that he did not need services, but he did express continued willingness to transport T.D. anywhere she needed to go.
*371 R.C. continued to call the Division worker multiple times a day even after the *919 Division obtained a restraining order prohibiting telephone calls. The worker acknowledged that R.C. never did "anything physical" and that the Division "was willing to allow him to be a [t]axi [d]river for [T.D.] to take to the Division," even after the restraining order was entered.
At trial, a Division supervisor acknowledged that R.C. threatened to take legal action, ensure Division workers were fired, and "use[d] a lot of foul language," but "never made any physical threats of harm." She never feared for her safety.
In October 2013 a new judge granted the Division's motion to (1) restrain R.C. from coming within 1000 feet of the Division's Newark office, (2) limit R.C.'s contact with the Division to written contact with counsel, and (3) suspend R.C.'s visits with Belle pending psychological and psychiatric evaluations. The court suspended services as to both T.D. and R.C. until they indicated a "willingness to participate."
C.
Alice was born in March 2014. She was discharged from the hospital into the care of T.D. and R.C. three days later. R.C. testified Alice was "perfect" and he took care of all of her needs, including purchasing supplies and taking her to the doctor for a check-up.
The Division was unaware of Alice's birth until the end of the month, when the Division learned that T.D. had "posted on Facebook that she just gave birth to a child." The Division went with the police to the home that day and performed a Dodd removal. Following Alice's removal, R.C.'s antagonistic communications with the Division continued.
Trial was held between December 2014 and June 2016. Various evaluations took place during the course of the trial. Court procedures contemplate a termination trial will be completed in thirty days and a decision rendered within two weeks thereafter. Chil dren in Court Operations Manual *372 , § 1706-07 (revised June 23, 2017). Unfortunately for the children, who were in placement the entire time, this matter was elongated.
In March 2015, R.C. submitted to a combined psychological and bonding evaluation performed by Mark Singer, Ed.D. At that point, R.C. had not seen Belle for over a year and had not seen Alice since her removal. R.C. told Dr. Singer during the evaluation that he had "only threatened [Division workers] with the [four] corners of law."
Dr. Singer concluded that although R.C. "appears to be committed to" T.D., "his presentation involved themes of paranoia, aggression, impulsivity, and tangential/confused thought processes." Dr. Singer was particularly concerned about R.C.'s "verbal behavior during the bonding evaluation," which Dr. Singer considered "suggestive of an individual who is experiencing a thought disorder and has poor reality testing, in addition to having limited ability to display empathy to the children."
Dr. Singer also evaluated T.D., noting she "clearly has physical and sensory limitations" and "presented tangential and in a confused manner at times." At trial, Dr. Singer said T.D. would need twenty-four-hour assistance to be able to parent. Dr. Singer concluded that "the currently obtained data does not suggest that [T.D.], nor [R.C.], either individually or collectively, are viable parenting option [sic] for these children and they are not likely to become viable parenting options for the children in the foreseeable future."
He recommended that visitations should take place in a therapist's office, with the parents meeting individually with the therapist first (therapeutic family visitation), *920 which the judge ordered in June 2015. The June order further provided that "[i]n the meantime and until such counseling is available," R.C. would be allowed weekly visits with Belle and Alice at the Division's Newark office. The Division was ordered to monitor and record the visits, as well as to provide transportation for both T.D. and R.C. *373 The Division made only one attempt in the next nine months to comply with the "therapeutic family visitation" provision in the June 2015 order. Between June 2015 and January 2016, the Division took no steps to locate a therapeutic visitation provider. The Division then contacted a single provider who, after being advised that R.C. made threats during visits, declined. By May 2016, after the judge had again ordered therapeutic family visitation, those visits were finally taking place.
Sean Hiscox, Ph.D., performed psychological and bonding evaluations on behalf of the Law Guardian between April and October 2015. Dr. Hiscox noted that T.D. "was cooperative, pleasant, and generally forthcoming." He noted that "[h]er thinking was sometimes tangential and hard to follow, but there were no overt signs of a psychotic disorder." He had "significant concerns about her parental fitness," due primarily to her physical condition and indications of "some cognitive problems."
Dr. Hiscox was also concerned about T.D.'s "poor perspective" regarding her daughters' "current situations," giving as an example T.D.'s stated belief that Belle would not experience any emotional harm if separated from the resource mother who had cared for her for the first three and a half years of her life. This demonstrated T.D. had impaired empathy and would not be able to meet her children's emotional needs. Dr. Hiscox concluded that T.D. was "unable and/or unwilling to provide minimally adequate care to her children."
Dr. Hiscox acknowledged at trial that he was unable to complete testing on T.D. Dr. Hiscox was unable to form an opinion as to R.C.'s parental fitness because R.C. had refused to cooperate with the psychological evaluation, but after reviewing the case background and observing him at the bonding evaluations, Dr. Hiscox had "concerns about his emotional stability and ability to parent."
As to the bonding evaluations, Dr. Hiscox concluded that Belle and Alice had "weak relationships" with both T.D. and R.C. He noted that T.D. was primarily focused on Mary and "was often completely unaware of" the younger girls' whereabouts, "which in *374 a home setting would be worrisome." R.C. initiated contact with the younger children, but he was sometimes "intense and intrusive, which at times caused them to be uncomfortable." Dr. Hiscox concluded that neither Belle nor Alice would experience emotional harm if their relationships with T.D. and R.C. were terminated.
II.
In his sixty-seven page decision, the trial judge determined the Division had failed to establish by clear and convincing evidence that T.D.'s and R.C.'s parental rights should be terminated. The judge found R.C. to be credible, noting that he "was not evasive" and his testimony, "although not concise, made sense." "His testimony was quite understandably at times emotionally charged, but in the opinion of the [c]ourt, appropriately so under the circumstances."
The judge found the caseworkers, although generally credible, did not provide credible testimony with regard to R.C.'s threats. He noted both a failure to recall and personal animosity on the part of the workers. The judge also noted that "several *921 Division employees testified that [R.C]. had left multiple voice mail messages threatening their safety," but did not find this testimony credible, particularly because the Division had been ordered to produce recordings of the alleged threats but failed to do so.
Regarding the experts, the judge found the testimony of Drs. Cox, Singer, and Hiscox to be "clear, candid and credible." However, the judge concluded that "they were not provided with all of the documentary information necessary to be able to properly formulate conclusions based upon the record." The judge found Dr. Iofin "to be not credible," argumentative, evasive, and inconsistent. The judge noted that "[t]hrough cross examination it became clear that his opinion was grounded in what can best be described as a subjective and tortured analysis of the 'facts' as he thought they should be."
The judge wrote:
*375 According to a Division witness, [Belle] was removed from the care and custody of her mother and father even though there were no issues with their residence, knowing that the most recent conviction the Division was aware of occurred in 1990, some 21 years in the past, and before [R.C.] was offered any services.
The finding that "the most recent conviction" of R.C. that the Division knew of "occurred in 1990" conflicts with the record regarding R.C.'s criminal history and the Division's knowledge of it.
The appellate record contains two judgments of conviction. In 1993, R.C. pled guilty to third-degree interfering with the custody of a child, (1) N.J.S.A. 2C:13-4(a)(1), and fourth-degree resisting arrest, (2) N.J.S.A. 2C:29-2, and was sentenced to four years' probation. In early 2007, R.C. pled guilty to third-degree terroristic threats, N.J.S.A. 2C:12-3(a). He was sentenced to five years in prison with a two-and-one-half-year parole bar.
A Division supervisor noted on March 1, 2012, that she discussed the Division's concerns regarding his "extensive criminal history" with R.C. and specifically asked him "why he served three years in state prison for threatening to kill someone." R.C. told her "he threatened to kill his ex-girlfriend and since he had a criminal history, he received a longer sentence than he should have." Thus, the Division was aware of the 2007 conviction at the time of Belle's removal.
The judge addressed the four prongs the Division was obliged to establish at the guardianship trial. Regarding prongs one and two, which require the Division to prove that a child's safety, health or development has been or will continue to be endangered and the parent is unwilling or unable to remedy the risk, the judge held that "the Division did not prove, even by a preponderance of the evidence, that either [T.D.] or [R.C.] are not able to parent either of their children at the current time and will not be able to do so in the foreseeable future." He found:
At trial, the Division employees who made the decision to remove [Belle] from the care and custody of her parents provided no credible testimony to support the purported risk posed by [T.D.]. With regards to the purported risk posed by [R.C.], although he had a decade-old criminal conviction and another conviction that was subject to discussion, there was no credible testimony provided by any Division *376 employee that [R.C.] had a "drug problem". As to his purported "history with the Division", [a caseworker] conceded at trial that his "history" amounted to him calling the Division in the past to make referrals about other people. Rather than review the Division records during *922 the two (2) weeks that the Division was contemplating the situation, the Division simply decided to accept the "red flags" that "popped up on the computer" when [R.C.]'s name was searched.
The judge also found that the record did not support the Division's representations, at the time of Alice's removal in March 2014, that (1) T.D. was "found to not be competent to care for a child;" (2) R.C. was in a gang, might have weapons due to gang affiliation, and was convicted of (as opposed to arrested for) endangering the welfare of a child; or (3) there was a history of domestic violence between T.D. and R.C.
The court found that T.D.'s "physical impairment was never proven to even remotely place any of her children at risk." It noted that Alice had lived with her parents for two weeks without incident and stated that T.D. "could never have placed Belle at risk because she was removed from her care at birth."
The judge stated R.C. was helpful to T.D. in her efforts to comply with services prior to Belle's birth. The judge found that Belle's removal at birth and Alice's uneventful two-week residence with him showed that R.C. never placed any child in danger.
A discussion of prong three, including the facts relevant to the reasonableness of the Division's services, was the primary focus of the judge's opinion. The judge wrote that he must determine whether T.D., who was physically disabled, "was properly provided with individualized treatment, and a full and fair opportunity to services that would allow her to benefit from or participate in services that are equal to those extended to individuals without disabilities." The judge detailed numerous ways in which the Division failed to address T.D.'s disability or to offer her properly individualized treatment.
The judge noted that, when Mary was removed in 2010, Judge Spatola had "made it clear that the Division would need to locate a service to assist [T.D.] in learning how to deal with her disability in terms of home making skills" and mentioned potential agencies *377 to contact. However, "[d]uring the trial, the Division did not offer any witness testimony as to what efforts, if any, the Division took to follow up on Judge Spatola's information."
The judge also relied on the ten recommendations that Dr. Cox had made in 2010 and noted that their "explicit purpose" was "to assist [T.D.] with her reunification efforts." The judge found the Division's efforts were "feeble" rather than reasonable. For example, regarding Dr. Cox's recommendation that the Division obtain T.D.'s medical records "and consult with her treating physicians about her physical limitations and what she can be expected to do on her own," the judge noted the Division either never obtained medical records or, if it did, failed to review them or provide them to its experts.
Similarly, in February 2012, FCS strongly recommended "comprehensive services geared towards her physical difficulties," but again the judge found the Division failed to prove that it made any effort to provide them. In addition, the judge found that, to meet the standard of reasonable services, the Division was obliged to provide T.D. with either in-home services or a viable transportation option. The judge stated:
The Division ignored the recommendation of Dr. Cox that in light of her MS, [T.D.] should receive services in her home. The record is silent as to the Division doing anything to accommodate/consider this very real and obvious impediment to the Division's cookie-cutter approach to [T.D.]'s situation. The *923 Division also ignored the obvious fact that the curb-to-curb service provided by Access Link would not be a viable option for a person with MS who is wheel-chair bound and without a ramp from her house to her walkway.
The judge also noted, "[f]or reasons that could not be rationally explained by any Division representative," his June 2015 order for therapeutic visitation was effectively ignored by the Division for nine months except for a single, failed phone call.
As to prong three, the judge held:
Starting with the Division expecting the wheel-chair bound [T.D.] to make her appointments by way of public transportation and "bus cards", right up through the Division ignoring a very explicit order dated June 26, 2015, that required the Division to retain a therapeutic visitation expert to engage the family in therapy, the record is replete with evidence of failures by the Division to provide [T.D.] with *378 recommended services and barren of evidence that meaningful services were actually supplied.
Regarding prong four, requiring the Division to establish that the termination of parental rights will not do more harm than good, the judge considered the bonding evaluations performed by Drs. Singer and Hiscox. He noted that the materials provided to the experts were deficient and their opinions therefore untrustworthy.
III.
The Division and Law Guardian argue that the trial judge erred in denying its guardianship petition and holding that it failed to establish each of the four prongs of N.J.S.A. 30:4C-15.1 by clear and convincing evidence.
The United States Supreme Court has held that biological parents' relationships with their children "is an interest far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). To protect that interest, courts impose "strict standards for the termination of parental rights," but parental rights are "not absolute." R.G., 217 N.J. at 553, 90 A.3d 1258 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 346-47, 736 A.2d 1246 (1999) ). Parental rights can be trumped by the State's parens patriae obligation to guard the health, safety, and welfare of children. Ibid.; In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992).
"The best-interests-of-the-child standard codified at N.J.S.A. 30:4C-15.1(a) 'aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility.' " R.G., 217 N.J. at 554, 90 A.3d 1258 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280, 914 A.2d 1265 (2007) ). The Division has the burden of proof by clear and convincing evidence because the consequences of finding that a child's best interests are served by the termination of the parental bond are permanent and irreversible.
*379 N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111, 842 A.2d 215 (App. Div. 2004).
The statute requires the Division to prove:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
*924 (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to the termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
[ N.J.S.A. 30:4C-15.1(a).]
This four-pronged test is fact-sensitive, and evidence used to satisfy one prong can also be used to satisfy another. K.H.O., 161 N.J. at 348, 736 A.2d 1246 ; see also R.G., 217 N.J. at 553, 90 A.3d 1258 ("These elements are not discrete and separate; they overlap to offer a full picture of the child's best interests.").
Our review of a trial court decision in a termination of parental rights case is limited. R.G., 217 N.J. at 552, 90 A.3d 1258. "In such cases, the trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid.
Reviewing courts should generally defer to the trial court's credibility determinations because the trial judge "has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand" and thus "has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104, 952 A.2d 436 (2008). "Moreover, by virtue of its specific jurisdiction, the Family Part 'possess[es] special expertise in the field of domestic relations' and thus 'appellate courts should accord deference to [F]amily [Part] factfinding.' " R.G., 217 N.J. at 553, 90 A.3d 1258 (quoting Cesare v. Cesare, 154 N.J. 394, 412-13, 713 A.2d 390 (1997) ).
*380 In a case such as this one, where the Division is the appellant, our Supreme Court has noted that even "greater deference is owed" to the trial court's determination "because a termination of parental rights is final and cannot be re-visited by the court." Ibid.
A.
The Division argues that the trial judge erred in finding it had failed to meet its burden as to prongs one and two. During a guardianship trial, the Division must establish under the first statutory prong of the statute that the health, safety, and development of a child has been or would continue to be endangered if a relationship with the parents was allowed to continue. J.C., 129 N.J. at 10, 608 A.2d 1312. Our Supreme Court has held that a parent's inability to provide care is harmful and can endanger the health of a child. K.H.O., 161 N.J. at 346, 352, 736 A.2d 1246.
Under the second prong, the trial judge is permitted to consider whether the parents would correct their conduct within the reasonably foreseeable future. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607, 512 A.2d 438 (1986).
The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are "the two components of the harm requirement" and "are related to one another." In re Guardianship of D.M.H., 161 N.J. 365, 379, 736 A.2d 1261 (1999). Therefore, "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." Ibid.
Our Supreme Court has explained that "the best interests standard does not concentrate on a single or isolated harm or past harm as such." K.H.O., 161 N.J. at 348, 736 A.2d 1246 ("Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship *925 over time on the child's health and development."). Although the presence of physical or sexual abuse establishes harm, the absence of such abuse is not dispositive and "serious *381 emotional injury and developmental retardation" also constitutes an injury to the child. A.W., 103 N.J. at 605, 512 A.2d 438.
Here, the judge heard considerable testimony regarding R.C.'s purported "threats" to the Division and found that R.C. never made an actual threat to the physical safety of any Division worker. This finding is supported by sufficient credible evidence, because the clear tenor of R.C.'s repeated calls was to demand the return of his daughters and to rant about retribution through legal channels. Even at his angriest, R.C. did not take physical actions toward workers. Moreover, as the trial judge found, the workers who testified that he spoke about guns or blowing up the federal building could easily have misheard, in light of his fast and rambling manner of speech.
The judge, however, was mistaken in not recognizing that the information the Division was able to glean about R.C.'s criminal history prior to Belle's birth provided legitimate reason for concern. The judge excluded the Promis/Gavel criminal court report from evidence because it revealed more than convictions, but the report was relevant to show the Division was aware of R.C.'s 1993 conviction for interfering with custody and 2007 conviction for threatening violence. Such prejudicial evidence may be excluded from lay jurors under N.J.R.E. 403. However, as professional jurists, Family Part judges are capable of reviewing this information and objectively determining its relevancy and probative value.
The judge's conclusion that there was no evidence of harm or risk of harm to the children in T.D. or R.C.'s care was not entirely correct. The Division was aware of R.C.'s recent criminal conviction, T.D.'s difficulty in raising Mary, and R.C.'s failure to cooperate with the Division. Regardless of any error in evaluating the first two prongs, however, the soundness of the decision as to the remaining prongs prevent reversal.
*382 B.
The Division and Law Guardian argue the trial judge erred in holding the Division failed to prove the third prong of the best-interests test because it "has provided more than reasonable efforts, over the course of six years, to [T.D.] and [R.C.]."
Pursuant to N.J.S.A. 30:4C-15.1(a)(3), the court must determine whether the Division made "reasonable efforts" aimed at the reunification of the family. K.H.O., 161 N.J. at 353, 736 A.2d 1246. Reasonable efforts include:
(1) consultation and cooperation with the parent in developing a plan for appropriate services;
(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
(3) informing the parent at appropriate intervals of the child's progress, development and health; and
(4) facilitating appropriate visitation.
[ N.J.S.A. 30:4C-15.1(c).]
The reasonableness of the Division's efforts depends on the facts in each case. D.M.H., 161 N.J. at 390, 736 A.2d 1261. "Services that may address one family's needs will not be helpful to another." Ibid. The judge found here that the Division took a "cookie-cutter" approach to dealing with T.D. and fell short of providing reasonable services. In particular, the Division failed to adequately take her MS
*926 into account when providing services. This finding was amply supported by the evidence.
The primary reason for Mary's removal was the filthy condition of T.D.'s home, but the Division did not work with T.D. to ensure that competent home health services were in place. Before Belle's birth, various experts and service providers recommended providing home services to T.D., but the Division did not do so until the middle of trial in 2015, when visits were ordered to take place in the home.
Also, the Division was aware that using Access Link created a problem for T.D., but it continued to insist that she use that service when transportation was not available through Medicaid, *383 FCS, or R.C. Until T.D. became pregnant with Alice and ceased participating in services altogether, she was consistent about attending and participating in visits and services whenever she had transportation that actually accommodated her disability. The Division's approach of repeatedly insisting that she simply use Access Link failed to take her individual needs into account.
The more global problem with the reasonableness of the Division's efforts to reunify T.D. with Belle and Alice was that it evidently accepted Dr. Cox's opinion that T.D. could not parent independently because of her MS. The Division never obtained T.D.'s medical records, although it was ordered to do so repeatedly, so it never determined the full extent of her physical limitations or what types of supports or services she might need to enable her to parent successfully. Despite any stereotypical misconceptions suggesting otherwise, parents with physical disabilities often parent children successfully. Without medical records, there is no way to determine how helpful those records might have been.
The Division's failure to provide reasonable services to T.D. and its attitude towards her disability continued after R.C. entered the picture and infected the Division's relationship with him as well. Moreover, the Division failed to implement court-ordered therapeutic family visitation until nearly a year had passed and the judge had ordered it a second time. Additionally, the Division's inability to prove its case against T.D. made termination of R.C.'s rights harmful to the children. "Two parents are better than one, even if one parent falls far below the ideal ...." N.J. Div. of Youth & Family Servs. v. D.S.H., 425 N.J. Super. 228, 242, 40 A.3d 734 (App. Div. 2012).
C.
The fourth prong, that termination would not do more harm than good, requires the court to determine whether the best interests of the child would be served by the termination of parental rights. E.P., 196 N.J. at 108, 952 A.2d 436. Prong four "serves as a fail-safe against termination even where the remaining *384 standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609, 926 A.2d 320 (2007) (emphasis added). Here, at the time of the bonding evaluations, the girls had had very little contact with their parents. The experts opined that severing the parental bond would therefore not harm the children. Proof of the fourth prong cannot overcome the lack of proof concerning another prong.
IV.
A.
The Division and the Law Guardian complain of other errors. They argue that some of the judge's credibility determinations were so unjust, wide off the mark, *927 and clearly mistaken that they should be overturned. They contend that the judge should have (1) disbelieved R.C. and believed Division witnesses on the issue of R.C.'s alleged threats, and (2) found Dr. Iofin to be credible. These arguments are directly at odds with long-settled appellate standards of review.
Reviewing courts recognize that "a trial judge who observes witnesses and listens to their testimony, develops 'a feel of the case' and is in the best position to 'make first-hand credibility judgments about the witnesses who appear on the stand.' " Slutsky v. Slutsky, 451 N.J. Super. 332, 344, 167 A.3d 660 (App. Div. 2017) (quoting E.P., 196 N.J. at 104, 952 A.2d 436 ). "In contrast, review of the cold record on appeal 'can never adequately convey the actual happenings in a courtroom.' " Ibid. (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448, 48 A.3d 1075 (2012) ). The judge backed up his credibility determinations by reference to substantial evidence in the record.
B.
The Division also argues that the trial judge erred in (1) precluding the rebuttal testimony of R.C.'s putative adult daughter, and (2) determining that testimony by Mary at trial was not *385 needed, given her prior discussions with the judge in chambers. The Law Guardian also argues that due process required the trial judge to (1) draw a negative inference from R.C.'s failure to participate in a psychological examination, and (2) consider R.C.'s criminal history.
Appellate courts review "the trial court's evidentiary rulings for abuse of discretion." State v. Gorthy, 226 N.J. 516, 539, 145 A.3d 146 (2016). An evidentiary ruling will be reversed only if it "was so wide off the mark that a manifest denial of justice resulted." Griffin v. City of E. Orange, 225 N.J. 400, 413, 139 A.3d 16 (2016).
Although we agree the judge incorrectly analyzed the Division's knowledge of R.C.'s criminal record and ignored R.C.'s refusal to cooperate with a psychological evaluation, these errors did not affect his findings regarding the Division's failure to make reasonable efforts to unify the family.
The Division and Law Guardian argue R.C.'s adult daughter should have been allowed to testify to rebut that R.C. "was a good parent." The judge acted within his discretion to deny the request to call R.C.'s daughter on rebuttal, as his ability to parent was not an unexpected issue raised by R.C. Rebuttal evidence is appropriate "when necessary because of new subjects introduced on direct or cross-examination" of witnesses. State v. Cook, 330 N.J. Super. 395, 418, 750 A.2d 91 (App. Div. 2000).
The Division also contends that Mary should have been permitted to testify "mainly to describe the living conditions she endured during her time with [T.D.], her role in caring for [T.D.] and her statements during therapy." The Law Guardian argues that Mary was a party to the case at that time and should have been required to testify. Both parties essentially accepted during trial that the judge had already heard from Mary through interviews that would be made part of the trial record.
*386 " 'Trial judges are given wide discretion in exercising control over their courtrooms' and have 'the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings.' " N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366, 175 A.3d 942 (2017)
*928 (quoting Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 264, 800 A.2d 132 (App. Div. 2002) ). Moreover, "[t]he protection of children from undue trauma when testifying is an important public policy goal." State v. T.E., 342 N.J. Super. 14, 29, 775 A.2d 686 (App. Div. 2001) (quoting State v. Smith, 158 N.J. 376, 385, 730 A.2d 311 (1999) ). We will not second-guess the judge's decision to shield Mary from further involvement in the litigation.
The Law Guardian's argument that the judge evidenced "bias against women" is without sufficient merit to require discussion in a written opinion. R. 2:11-3(e)(1)(E).
The trial judge's determination that the Division did not provide reasonable services to the parents is well-supported by credible evidence in the record. Without meeting this third prong, the Division was unable to prove its case.
Affirmed.

A reorganization of the Department of Children and Families under L. 2012, c. 16, effective June 29, 2012, changed the name of the Division of Youth and Family Services to the Division of Child Protection and Permanency. We use the term "Division" throughout this opinion to refer to both names.

We consolidated these appeals on September 7, 2016.

On November 9, 2016, we entered an order staying overnight visitation and final reunification until "appropriate assessments and evaluations are completed and supervised family visitation and a therapeutic program can be implemented by the trial court ...."

The children were placed in different resource homes. According to our review of the Division records, it appeared that neither placement had a high likelihood of permanence.

T.D.'s teen-aged son was then living at the home. He has since aged out of the litigation.

" 'A Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11, 11 A.3d 844 (2011) (quoting N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2, 992 A.2d 20 (App. Div. 2010) ).