# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2659-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

T.N.G. and P.H.,

     Defendants,

and

D.C.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.P.G.,
L.D.G., and J.A.H., minors.

_____

Submitted May 12, 2025 – Decided July 21, 2025

Before Judges Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0028-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Lora B. Glick, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Lakshmi R. Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors L.P.G. and L.D.G. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant D.C.[1] ("Darrell") appeals from the April 15, 2024 order terminating parental rights to his twin sons, L.P.G. and L.D.G. ("Larry" and "Lonnie"), born in May 2020. For the reasons that follow, we affirm.

I.

In May 2020, T.N.G. ("Talia") gave birth to twins, both of whom were underweight and tested positive for cocaine at delivery. Talia had a prior history with the New Jersey Division of Child Protection and Permanency ("DCPP" or

---

[1] We use initials and fictitious names to identify the parties to protect and preserve their confidentiality. R. 1:38-3(d)(12).

"Division"), having lost parental rights to three older children due to substance abuse and related challenges. Following their discharge from the hospital, the twins were placed in the care of C.H. ("Carol"), a resource parent who had previously adopted their two older half-sisters and would later serve as resource parent for their younger half-sibling, J.H. ("Jesse"). The Division explored alternative kinship placements for the twins, including extended family and friends of Talia and Darrell, but these options were ultimately declined.

Throughout the Division's involvement and litigation, the twins remained in the resource family's home, where they lived with biological half-siblings. The twins' special medical needs were addressed by the resource parents.

The Division commenced litigation by filing an order to show cause and guardianship complaint on August 4, 2021, seeking to terminate the parental rights of Darrell and Talia. Initially, neither parent had been served with process, and their whereabouts were unknown to the Division. Multiple case management hearings occurred as the Division attempted to locate, serve, and engage both parents in services, including paternity testing for Darrell.

Darrell was personally served with the guardianship complaint while incarcerated in March 2022. The Division then filed an amended guardianship

3

complaint in September 2022, consolidating proceedings to include Jesse and his father, P.H. ("Paul"), under the same docket number.

After confirming Darrell's paternity in June 2022, the Division facilitated monthly visits between Darrell and the twins, beginning in October 2022 at Bayside State Prison. Visits initially occurred in a no-contact format due to COVID-19 restrictions. Upon his release from incarceration in March 2023, Darrell resided at a halfway house, engaged in substance abuse treatment, and participated in weekly visits with the twins at Division offices through June 14, 2023, when he was released to a shelter. Afterward, Darrell's engagement with Division services and visitation became inconsistent, ultimately ceasing altogether. The Division continued outreach, but Darrell did not reestablish contact sufficient to resume visitation or further evaluations.

The Trial

The Division proceeded with a guardianship trial in March 2024, presenting testimony from its expert, Dr. Elizabeth Stilwell, an adoption worker, and the twins' resource parent, Carol. Darrell was noticed of the trial and appeared on one day of trial but did not testify or call any witnesses. The Law Guardian for the children participated and supported termination of parental rights.

4

On April 15, 2024, the trial court issued an oral and written decision, terminating the parental rights of Darrell and Talia to the twins and the parental rights of Paul and Talia to Jesse. The court found the Division had met all four prongs of the statutory "best interests" standard by clear and convincing evidence pursuant to N.J.S.A. 30:4C-15.1(a).

Although recognizing Darrell's efforts and participation, the court found he did not provide a stable plan for the twins due to ongoing homelessness and failure to consistently engage in Division services. The court emphasized the lack of a bond between Darrell and the twins.

The court found Dr. Stilwell's testimony credible "based on her detailed recounting of the evaluations and case history . . . [with] her opinions . . . constantly drawn from her observations and training."

Dr. Stilwell performed a psychological assessment of Darrell in December 2022, while Darrell was incarcerated. She initially recommended Darrell remain a caregiving option for the twins but only if he participated in a substance abuse evaluation, parenting skills training, and consistent visitation. Dr. Stilwell confirmed that after he transitioned from a halfway house to a shelter, Darrell missed multiple scheduled evaluations, did not exercise visitation, and did not engage in any DCPP services, despite regular attempts. Ultimately, she

concluded that "[Darrell] is unlikely to become capable of independent[ly] parenting . . . his children in the foreseeable future and that the children's interests would be best served by terminating parental rights."

The court recounted that the resource parent, Carol, testified to having discussions with the Division regarding kinship legal guardianship versus adoption and demonstrated a clear understanding, committing herself to adoption.

The Four Prongs

In making its findings, the court assessed whether the Division had met its burden to prove by clear and convincing evidence the four statutory factors, or prongs, to terminate parental rights:

(1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3)  The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)  Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

In making its findings, the court acknowledged the "four prongs are not discreet and separate but are related, no [sic] overlap with one another [and] provide a comprehensive standard of the child's best interest."

Regarding the first prong, the court found Darrell's absence from the children's life to be a harm for which there is no true remedy. Elaborating, the court said:

> [Darrell] has never provided a concrete plan to safely care for [Larry and Lonnie] and has yet to substantially engage in services. More importantly . . . [Darrell, Talia, and Paul] have failed to be stable figures in the children's lives for several years. None of the parents have visited the children in roughly two years.

The court continued:

> The parents have each failed to comply with services that would allow them to safely parent, such as parenting skills, substance abuse treatment, evaluations, therapy, or visitation. Throughout the litigation, the parents have been made aware of the various requirements and have yet to fully present a concrete plan as to how they could safely parent. It is clear that the parents have harmed their children and cannot parent now or in the foreseeable future.

As to the second prong, the court found "the parents have consistently delayed participation in services and failed to complete services. Their delays deprive[d] the minor children of permanency that they deserved."

The court assessed the two-part criteria of prong three: whether the

7

Division has made reasonable efforts to provide services to help the parents correct the circumstances which led to the children's placement outside the home, and whether the court has considered alternatives to termination. As noted, the court found the twins' parents did not avail themselves of a variety of offered services tailored to their needs. Rather than engage, the court found the "parents repeatedly delayed their participation and made excuses as to why they could not fully participate in services or visitation" and that "the parents were mostly uncommunicative."

The fourth prong required the court to determine whether terminating parental rights would cause more harm than good. Where the child's bond with the biological parent is so substantial that termination would cause greater harm than good, the fourth prong is not satisfied. This prong requires a determination as to whether the resource parents can serve as a stable alternative and ameliorate any adverse effects of the termination. The court recognized:

> The three minors have lingered in the foster care system since birth while the defendants have failed to adequately address the issues preventing them from safely parenting. Each parent has had inconsistent contact with the children and failed to put forth an adequate parenting plan. Additionally, the parents have failed to complete recommended programs and comply with services based on the testimony of Dr. Stilwell and [the caseworker] along with the totality of evidence, it is unlikely that the parents will be able to provide

8

stability and permanency in the foreseeable future. Neither [Darrell] nor [Paul] appeared for any evaluations which would have determined their ability to parent or the nature of their relationships with their children. . . . With regard to [Darrell,] Dr. Stilwell testified that quote, "The children had not come to see him as a parental figure and they had not formed a secure attachment with him; terminating his relationship with them would likely not be disruptive to the children," end of quote, and recommended the termination of parental rights to allow the children to be adopted. Further, all three children have been placed in the same home with their other half siblings not subject to this litigation since birth. . . . Therefore, []termination of [the natural parents'] parental rights will not do more harm than good. Therefore, the . . . fourth prong has been satisfied.

Neither Talia nor Paul appealed the termination of their parental rights. Darrell filed a timely notice of appeal.

## II.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We will uphold the court's factual findings if they are "supported by adequate, substantial, and credible evidence." Ibid. "Concomitantly, reviewing courts should defer to the trial court's credibility determinations." Ibid. We do so because the court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can

9

never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)). Our Supreme Court has reiterated "a trial court's factual findings [in a guardianship action] 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). However, we review the trial court's legal interpretations de novo. R.G., 217 N.J. at 552-53.

The State is required to meet four statutory factors in its application to terminate parental rights, referenced here by the trial court in its findings of fact and conclusions of law. N.J.S.A. 30:4C-15.1(a). As this court acknowledged, these four factors are not "discrete and separate," but rather overlap to provide a comprehensive picture of what may be necessary to provide for the best interests of the child. M.M., 189 N.J. at 280. Thus, evidence pertaining to one prong may also be used to form the basis to establish another prong. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379-80 (App. Div. 2018). However, the "'best interests of a child' can never mean the better interests of the child." N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 603 (1986). "It is . . . incumbent upon the [Division] . . . to show more than that

it will provide a better home for the child. It must demonstrate affirmatively that the child's 'best interests' will be substantially prejudiced if he is permitted to remain with his parent[.]" Ibid. (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 340-41).

The Division must prove each of the four factors by clear and convincing evidence. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 168 (2010). "[T]he evidence must be 'so clear, direct and weighty and convincing as to enable' the factfinder 'to come to a clear conviction, without hesitancy, of the trust of the precise facts in issue.'" N.J. Div. of Youth & Fam. Servs. v. H.P., 424 N.J. Super. 210, 225 (App. Div. 2011) (quoting In re Seaman, 133 N.J. 67, 74 (1993)).

Defendant posits the trial court misapplied the law and that its findings of fact were not supported by credible evidence in the record. We note at the outset that the twins were not removed from Darrell, but rather from their biological mother, Talia, who is not a party to this appeal. Nonetheless, application of the four-prong standard is appropriate.

On prong one, "the relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent," M.M., 189 N.J. at 289, or of a "parent's inability to provide care [that] is harmful and can

endanger the health of the child." T.D., 454 N.J. Super. at 380-81. Harm to a child may result from a parent's incapacity or failure to take responsibility for the child. See N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013) (finding that a parent's failure to provide a stable home for a child and their criminal arrests and incarcerations created a serious risk of emotional long-term harm). However, our Supreme Court has concluded that "incarceration alone – without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard – is an insufficient basis for terminating parental rights." R.G., 217 N.J. at 555. If termination is sought based on the incarceration of a parent, consideration should be given to the parent's attempts to communicate and have a relationship with the child during his incarceration and the level of concern displayed by the parent as to the child's well-being. Ibid.

In cases involving substance abuse, as here, a parent's willingness to accept and respond to treatment is informative. N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 481-82 (App. Div. 2012). "When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, [prong one] of the statute has

been proven." H.R., 431 N.J. Super. at 223. In sum, to satisfy the first prong, there must be evidence that the incapacity resulted in actual harm or endangerment to the child. In re Guardianship of K.H.O., 161 N.J. 337, 349 (1999).

The second aspect of the analysis evaluates a parent's ability and willingness to eliminate the harm, N.J.S.A. 30:4C-15.1(a)(2) and whether a parent's inability of unwillingness to provide a safe and stable home for the child resulting in a delay of permanent placement will add to the harm. Ibid.

On prong one, the court acknowledged there had been no findings of abuse or neglect made against the parent. Consistent with case law, the court did not rest its findings solely on Darrell's incarceration. Rather, it focused on Darrell's unwillingness to engage in services offered by the Division after his release. The court found his extended absence and failure to engage in services and inability or unwillingness to make a plan for the children harmed the children by depriving them of a safe and stable environment. Those findings are supported by substantial evidence in the record.

On prong two, the court found it was "reasonably foreseeable" that Darrell would continue to "inflict harm" on the twins because during the years he has "consistently delayed participation in services and failed to complete services."

13

That delay harmed the twins by delaying their permanency while they remained in placement "for the entirety of their lives, leaving them with an uncertain future" and depriving them of permanency "necessary for proper child development." In making those findings, the court relied on Dr. Stilwell's testimony that Darrell had "parenting deficiencies, which precluded him from being able to independently care for his children, and given the circumstance and his history, that he was unlikely to become a viable parenting option in the foreseeable future." In considering this prong, the trial court also considered our Supreme Court's guidance in R.G., that "[i]ncarceration is . . . probative of whether the parent is incapable of properly caring for . . . or has abandoned the child." 217 N.J. at 554-55.

While a parent's continued failure to provide a stable home for the child may serve as a basis for establishing the second prong, N.J.S.A. 30:4C-15.1(a)(2), that prong may not be established until the Division has proved that it has met its obligation to make reasonable efforts to provide services to help the parent eliminate the issue that led to the child's placement in the first instance. N.J.S.A. 30:4C-15.1(a)(3); see T.D., 454 N.J. Super. at 380-83. From our review of the record, we are satisfied that the Division met its obligation to make reasonable efforts to provide services to assist Darrell, which he did not

14

accept.  See <u>N.J. Div. of Youth & Fam. Servs. v. F.M.</u>, 211 N.J. 420, 452 (App. Div. 2012) ("The diligence of [the Division's] efforts on behalf of the parent is not measured by whether those efforts were successful.") (internal quotation marks omitted).

The third prong also requires the court to consider alternatives to termination.  <u>K.H.O.</u>, 161 N.J. at 354.  "Reasonable efforts" is defined in N.J.S.A. 30:4C-15.1(c) as "attempts by an agency . . . to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]"  This includes, but is not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
> (4) facilitating appropriate visitation.

With respect to incarcerated persons, the Division is not relieved of its obligation to provide services merely because a parent is incarcerated.  <u>R.G.</u>, 217 N.J. at 562-63.  Our Supreme Court has acknowledged that although "providing services to incarcerated persons is difficult and may be futile, . . . the Division should not avoid providing services to all incarcerated persons,

regardless of their seeming unwillingness to improve their parental fitness." Ibid. In R.G., the court expressed that "particularly when an incarcerated parent's release is imminent, [and] the other parent has relinquished her rights to their child, and the incarcerated parent has expressed a willingness to improve his parenting skills and a desire to deepen his parent-child relationship, the Division must do more[.]" Id. at 563.

Regarding the second aspect of prong three, our jurisprudence recognizes two permanency options; KLG and adoption. P.P., 180 N.J. at 507-08 (citing N.J.S.A. 3B:12A-1). KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver. See N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-25 (2010) (discussing the KLG Act and its intent). Unlike termination of parental rights, KLG does not cut off the legal relationship between parent and child. N.J. Div. of Youth & Fam. Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003). The parent remains entitled to visitation and has the right to seek termination of guardianship and resumption of custody at a later date if he or she is able to provide a safe and secure home for the child. Ibid.

For cases involving alternatives to termination, the feasibility of appointing a KLG are considered under prong three. R.G., 217 N.J. at 558. The

State has an obligation to support the child's relationship with a parent, including by considering alternatives to the termination and providing services that mitigate potential harm to the child. In re Guardianship K.L.F., 129 N.J. 32, 43 (1992). A child's attachment to third parties "does not provide an independent basis for termination where the other standards have not been satisfied." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "Once [the caregiver] is provided with [the benefits and burdens of a KLG], the caretaker's preference between the two alternatives should matter." M.M., 459 N.J. Super. at 263. However, while the resource parent or caregiver's preference is relevant, it is not dispositive. Id. at 264.

Concerning the first part of prong three, the trial court properly concluded the Division undertook reasonable efforts to reunify Darrell with the twins. It found that the services, which included parenting skills, individual therapy, psychological assessments, family team meetings, transportation assistance, substance abuse evaluation, and visitation were specially tailored to Darrell's needs as a recently-released incarcerated person. The court observed that Darrell repeatedly delayed participation, made excuses for not fully participating, and was uncommunicative with the Division.

A-2659-23

Concerning the second part of the third prong, the trial court found there were no alternatives to termination of parental rights. The Division's efforts to find a safe placement with relatives were not successful and none of the ruled-out relatives appealed. And as recited, Carol's testimony reflected "a clear understanding of the differences between KLG and adoption." Under the circumstances, her wish to keep the five siblings together in an adoptive household was reasonable and properly informed the court's decision-making authority.

Expert Testimony and Net Opinion

Defendant also argues the trial court abused its discretion by accepting as true the alleged net opinions of DCPP's expert, Dr. Stilwell, as those opinions were speculative and unsupported by the evidence. In opposition to Dr. Stilwell's findings, defendant contends the record clearly shows "Darrell's loving and nurturing the twins and their forming a tender and trusting attachment to him."

The net opinion rule bars admission "of an expert's conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cnty. of Essex (Polzo I), 196 N.J. 569, 583 (2008)). Therefore, experts must "be able to identify the factual bases for their

conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [scientifically] reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo I, 196 N.J. at 583). An expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, L.L.C., 216 N.J. 115, 144 (2013)). However, an expert's failure "'to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'" Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)).

There is no question Dr. Stilwell's testimony was critical to the court's decision. The court found it significant that Darrell had "inconsistent contact with the children and failed to put forth an adequate parenting plan." The court cited Dr. Stilwell's unrebutted expert opinion that the twins do not view Darrell as a parental figure or have a secure attachment to him. Thus, in its assessment of prong four, the court agreed with Dr. Stilwell that Larry and Lonnie would

19

be harmed and likely "regress emotionally and behaviorally" if removed from their resource family.

We disagree, however, with defendant's contention that Dr. Stilwell's findings constituted a net opinion. As the Division observes in their brief, "[Dr. Stilwell] requested updated visitation information so she could evaluate [the twins'] attachment based upon the 'totality of the relationship' between Darrell and the twins." The record of this case provided ample reliable evidence to provide the bases for the doctor's opinions. The trial court did not abuse its discretion by relying on those opinions and other credible evidence in reaching its own conclusions that the children would not suffer more harm than good from termination of parental rights.

To the extent we have not addressed any remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2659-23