# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4823-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

F.F., Jr.,

    Defendant-Appellant,

and

J.A.,

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.L.F.,

    a Minor.

_____

Submitted January 14, 2019 – Decided January 25, 2019

Before Judges Fasciale and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0144-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth A. Harrigan, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy M. Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

Defendant appeals from a June 7, 2018 order terminating his parental rights to his son, J.L.F. (the child), born in November 2016. He contends that the Division of Child Protection and Permanency (the Division) failed to prove the four prongs of the statutory best interests test by clear and convincing evidence, and that the judge erred in admitting hearsay evidence in order to render her decision. We disagree and affirm.

I.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove by clear and convincing evidence the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to [the judge's] fact[-]finding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). Thus, the judge's findings of fact are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Here, the judge's findings are supported by substantial credible evidence in the record.

"When a biological parent resists termination of his or her parental rights, the [trial judge]'s function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The judge's factual findings, "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova, 65 N.J. at 483-84). "[T]he conclusions that logically flow from those findings

of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

## II.

As to the first prong, the judge relied on testimony from Dr. Linda Jeffrey, who performed a psychological evaluation of defendant and a bonding evaluation of defendant and the child and the foster parents – his paternal aunt and uncle – and the child. The judge explained how Dr. Jeffrey noted that defendant "had an inability to relate to others in a reality, orderly based way," and this restricted his ability to "provide a psychological or physically safe environment for the child." Dr. Jeffrey said that defendant's "disorganized, schizophrenic thought or speech affects his ability to form therapeutic alliances for the child. He may work the child into his delusions. He focuses on himself not his child's needs. He can't convey normal developmental information and doesn't focus on the child's normal development needs." The judge felt that based on a "reasonable degree of psychological certainty," Dr. Jeffrey concluded that "the results of the psychological evaluation and the bonding evaluation indicat[ed] that [defendant] was not prepared to provide a minimal level of safe parenting." The judge explained that

> Dr. Jeffrey opined that the child would likely be placed
> at risk of harm in [defendant's] care and that a minimal

5

level of safe parenting just meant that the child could make normal, developmental progress, that the caregiver can detect that the child has problems and seek the necessary intervention, and based on her evaluation[,] . . . [defendant] could not do that.

Additionally, the judge stated that

there was not even an affectionate tie between [the child] and his father. There was no attachment whatsoever, and because there was no attachment[,] essentially [defendant] was a stranger and that [the child] displayed chronic distress in proximity to [defendant]. [Defendant] displayed no child management services and [the child is] likely to be placed at risk in [defendant]'s care and, in fact, severance of that bond will not cause serious and enduring harm [to the child] because there is no bond.

In contrast, the child was "happy in his comfort zone," with the aunt and uncle. Dr. Jeffrey felt that severing the child's secure attachment with the aunt and uncle would place the child at risk for "serious and enduring harm, particularly during this critical period of attachment formation." Dr. Jeffrey also stated the child had a "critical need for permanency in order to meet his milestones and flourish."

The focus of this prong should be on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "Mental illness, alone, does not disqualify a parent from raising a child. But it is a different matter if a parent refuses to treat

6

his mental illness [or] the mental illness poses a real threat to a child . . . ." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450-451 (2012). The judge considered that Dr. Jeffrey concluded defendant "was not prepared to provide a minimal level of safe parenting" to the child. Dr. Jeffrey opined that defendant "did not display an ability to engage in realistic appraisal of his child's needs" and that it was possible that defendant could "work the child into [his] delusions," or "perceive the child as a threat." Additionally, the judge concurred that the child would suffer harm if separated from the aunt and uncle.

As to prong two, our Supreme Court has opined that

> the second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

Here, the judge said that defendant is unwilling or unable to eliminate the harm

> because he has not availed himself of the services . . . despite transportation and re-referrals and re-referrals and re-referrals and he's got an answer every time about why he's not going to services and he's in denial to a large extent and he's not truthful about what he needs or what he's participating in.

A-4823-17T1

Defendant feels that he "complied with the insufficient services that were offered when he could." But there were many instances when defendant willingly chose not to attend programs or provided excuses for why he was unable to attend. He also told psychological professionals and hospital staff members that he did not need assistance and would not comply with resources that were available to him.

As to prong three, the judge found that the Division demonstrated by clear and convincing evidence that it offered "more than reasonable services" to defendant, but that defendant did "not avail[] himself" of those services. As of the trial, defendant did not "say he was engaging in any mental health therapy, no [domestic violence] services, no [psychological] therapy, no parenting skills programs, [and did] not report[ that] he was on medication for mental health." The judge emphasized that defendant was "either in denial or just does not want the help and will not avail himself of the necessary treatment."

Because of his mental health issues, defendant claims that he is entitled to reasonable accommodations for services under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213. He cites to L.A.S., 134 N.J. at 139, in which our Supreme Court stated that, the considerations involved in determinations of parental fitness are "extremely fact sensitive" and require

particularized evidence. He also claims that the Division failed to timely provide him with the proper three-zone bus passes that he would have needed to see psychologist Dr. Larry Seidman, and attend other services. He further argues that the Division failed to provide the mental health professionals with collaterals or records.

For the first time on appeal, defendant argues that the Division violated the ADA. Under Title II of the ADA, the Division qualifies as a "public entity," and the Division's services constitute "services, programs, or activities." 42 U.S.C. §§ 12131(1), 12132. Defendant feels that the Division's "cookie-cutter approach" resulted in its failure to make reasonable efforts to provide services to help defendant. "'Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). But, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999). "These efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case." Ibid.

Defendant cites to New Jersey Division of Child Protection & Permanency v. T.D. (In re M.G.), 454 N.J. Super. 353, 382-83 (App. Div. 2018) in claiming that the Division is mandated to tailor its services based on an individual defendant's medical needs. In T.D., we stated that the Division failed to provide the defendant, who had multiple sclerosis, with adequate transportation assistance. Ibid. Yet here, the Division provided passes and also gave defendant rides to visits, appointments, and even to see the mother in the hospital. He was also specifically told to inform the Division if he needed a ride to an appointment. In T.D., the defendant attempted to inform the Division of problems with her accommodations and requested that the Division provide more reasonable measures, all while still actively involved in Division sessions and classes. But here, defendant refused to participate in its programs and mandated treatment.

In New Jersey Divison of Youth & Family Services v. A.G., 344 N.J. Super. 418, 424 (App. Div. 2001), we affirmed the termination of parental rights of a mother with mental illness. "The majority of the courts that have considered the issue have concluded that the ADA does not provide a defense to a termination of parental rights proceeding." Id. at 442. We stated that applying the ADA "to constitute a defense to a termination proceeding would improperly

elevate the rights of the parent above those of the child." Ibid. Moreover, we explained that, "[t]he Division's efforts in providing classes and parenting programs must by their very nature take into consideration the abilities and mental conditions of the parents." Ibid.

Additionally, the third prong requires the judge to have "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). The aunt and uncle have stated numerous times that they intend to adopt the child.

The fourth and final prong under N.J.S.A. 30:4C-15.1(a) requires the Division to prove that "[t]ermination of parental rights will not do more harm than good." It has been described as, "a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). This prong

> cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with [his] foster parents.
>
> [K.H.O., 161 N.J. at 355.]

The judge noted that terminating defendant's parental rights does not mean that defendant does not love the child or that the child does not love defendant, but

11

instead the focus is on whether the Divison has demonstrated that termination of parental rights will not do more harm than good.

Our Supreme Court has explained that, "[t]he risk to children stemming from the deprivation of the custody of their natural parent is one that inheres in the termination of parental rights and is based on the paramount need the children have for permanent and defined parent-child relationships." In re Guardianship of J.C., 129 N.J. 1, 26 (1992). Courts should consider "the testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Id. at 19. This is precisely what the judge did, despite defendant's suggestion that nothing in the record "conclusively establishes that [defendant] could not safely raise [the child]."

III.

A judge's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382 (2010). A parent has a right to effective assistance of counsel in a termination of parental rights case. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 306 (2007). For a defendant to obtain relief based on ineffective assistance grounds:

A-4823-17T1

> (1) counsel's performance must be objectively deficient – i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense – i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [Id. at 307 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984); accord State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland standard in New Jersey)).]

Defendant argues that trial counsel's "failure to object to the admission of hearsay in medical records from Cooper University Medical Hospital [(CUH)], Dr. [Alexander] Iofin and Dr. [Carissa] Ferguson-Thomas without requiring expert testimony constituted ineffective assistance of counsel . . . ." Alternatively, he claims that admitting these records without expert testimony was plain error.

Although defendant claims that trial counsel did object to information provided during a Division worker's testimony from the CUH records, he feels that counsel was ineffective because at that time, counsel did not even know that the records were already in evidence. Thus, counsel should have properly objected when the records were initially introduced. When counsel was informed that the records were already admitted, he withdrew his objection. He

then objected a second time, but the judge allowed the testimony as a foundation for additional follow-up questions.

Rule 5:12-4(d) permits "reports by staff personnel or professional consultants" into evidence, subject to the requirements of N.J.R.E. 803(c)(6) and N.J.R.E. 801(d). Under N.J.R.E. 801(d), a "business" "includes every kind of business, institution, association, profession, occupation and calling, whether or not conducted for profit, and also includes activities of governmental agencies." N.J.R.E. 803(c)(6) governs records of regularly conducted activity and states:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

N.J.R.E. 808 provides:

> Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

14

Here, the circumstances established the trustworthiness of the records.

In the context of abuse and neglect, we have explained that:

> To be admissible as a business record of the Division, a Division report must meet the requirements of N.J.R.E. 803(c)(6), whether the report is offered under N.J.S.A. 9:6-8.46(a)(3), Rule 5:12-4(d), or In re Guardianship of Cope, 106 N.J. Super. 336 (App. Div. 1969). If a Division report is admissible under N.J.R.E. 803(c)(6) and meets the requirements of N.J.S.A. 9:6-8.46(a)(3), Rule 5:12-4(d), or Cope, the court may consider the statements in the report that were made to the author by Division staff personnel, or affiliated medical, psychiatric, or psychological consultants, if those statements were made based on their own first-hand factual observations, at a time reasonably contemporaneous to the facts they relate, and in the usual course of their duties with the Division. However, whether the Division report is offered under N.J.R.E. 803(c)(6), N.J.S.A. 9:6-8.46(a)(3), Rule 5:12-4(d), or Cope, statements in the report made by any other person are inadmissible hearsay, unless they qualify under another hearsay exception as required by N.J.R.E. 805. Expert diagnoses and opinions in a Division report are inadmissible hearsay, unless the trial court specifically finds they are trustworthy under the criteria in N.J.R.E. 808, including that they are not too complex for admission without the expert testifying subject to cross-examination.
>
> [N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 487 (App. Div. 2016).]

In N.T., because we felt that the diagnoses and opinions were "central to the trial [judge]'s finding of abuse or neglect," admitting the psychologists' diagnoses

and opinions in her evaluation was not harmless. Id. at 503. There, the trial judge "ascribed almost determinative significance to [the psychologist's] opinion, which went to the heart of the case." Ibid. (quoting Neno v. Clinton, 167 N.J. 573, 587 (2001)). "A hearsay error mandates reversal where it appears 'the error led the [factfinder] to a result it otherwise might not have reached.'" Ibid. (alteration in original) (quoting Neno, 167 N.J. at 586). We also felt that "overruling the hearsay objection prevented [the psychologist]'s diagnoses and opinions from being tested by cross-examination. Thus, their improper admission constituted a manifest denial of justice and was 'clearly capable of producing an unjust result,' requiring reversal." Ibid. Here, though, because the judge relied on Dr. Jeffrey's testimony in rendering her decision under the four prongs, there was not a "manifest denial of justice" requiring reversal.

"[W]hen the expert is not produced as a witness, the rule requires the exclusion of his or her expert opinion, even if contained in a business record, unless the trial judge makes specific findings regarding trustworthiness." Id. at 501.

> In any event, "[a]n expert medical opinion contained in a report is generally inadmissible under [N.J.R.E. 808's] test because of the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert." Similarly,

psychological evaluations generally "entail[] the exercise of subjective judgment rather than a straightforward, simple diagnosis based upon objective criteria or one upon which reasonable professionals could not differ."

[Ibid. (alterations in original) (citations omitted).]

We have stated that:

In the event that such reports contain conclusions drawn from the facts stated in them, the reports may still be admitted, but they should be treated as no more than prima facie evidence of the validity of the conclusions contained in them. If the parent produces evidence refuting such conclusions, petitioner would then have the burden of producing live testimony in order to establish their validity.

In the case of conclusionary statements, the author should be a person qualified to give an opinion on the subject under discussion (e.g., a psychiatrist or psychologist for diagnosis of mental disease or impairment), and no conclusion should be received unless the report contains a statement of the facts or procedures upon which it is based.

[Cope, 106 N.J. Super. at 344.]

In N.T. we said that,

whether a Division report is offered under N.J.R.E. 803(c)(6), N.J.S.A. 9:6-8.46(a)(3), Rule 5:12-4(d), or Cope, expert opinions and diagnoses in the report are inadmissible hearsay unless the trial court specifically finds they are trustworthy under the criteria in N.J.R.E. 808, including that they are not too complex for admission without the expert testifying subject to cross-

17

examination. Because the trial [judge] made no such finding, and because [the psychologist]'s diagnosis and opinion in the [e]valuation are complex, admitting them over [defendant]'s hearsay objection was "wide of the mark."

[445 N.J. Super. at 502.]

Here, the judge did not make a specific finding regarding trustworthiness of the CUH records and of Dr. Iofin's or Dr. Ferguson-Thomas's reports, but she did not extensively cite them in rendering her opinion on each of the four prongs. Instead, the judge referenced the CUH records to show that defendant was admitted to the psychiatric unit, why he went to the hospital, and what symptoms he reported. She referenced Dr. Iofin's and Dr. Ferguson-Thomas's reports in two brief moments in her oral opinion – as demonstration of defendant's history of noncompliance with the Division, not as evidence of a complex diagnoses. These three records did not provide the basis of her decision.

Thus, defendant has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." B.R., 192 N.J. at 307. Instead, even if the judge would not have admitted the CUH record and the two doctors' reports into evidence, based on Dr. Jeffrey's testimony, she still would have come to the same conclusion.

Defendant has failed to meet both prongs of <u>Strickland</u>. He has not proven that trial counsel's performance was deficient, or so egregious that he was not functioning as defendant's constitutionally guaranteed counsel. Trial counsel did object to the admission of this evidence, but the judge chose to allow the records in and afford them due weight. Second, defendant has not proven that counsel's deficient performance prejudiced the defense, or that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. Even if the documents would have been inadmissible, the judge still based her decision on Dr. Jeffrey's testimony, thus rendering any error harmless and unworthy of reversal. Thus, defendant's ineffective assistance of counsel claim must fail.

Defendant also claims that the judge committed plain error.

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.
>
> [<u>R.</u> 2:10-2.]

But again, as the judge primarily referenced Dr. Jeffrey's testimony and report in her opinion, any error in admitting the documents would be harmless and unworthy of reversal.

A-4823-17T1

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4823-17T1