# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0551-23
               A-0552-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

J.G. and J.M.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.M.
and L.M., minors.

_____

Argued October 15, 2024 – Decided December 19, 2024

Before Judges Sabatino, Gummer, and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FG-21-0102-23.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant J.G. (Jennifer Nicole

Sellitti, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

Catherine Reid, Designated Counsel, argued the cause for appellant J.M. (Jennifer Nicole Sellitti, Public Defender, attorney; Catherine Reid, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Karen M. Stecker, Assistant Deputy Public Defender, argued the cause for minors (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Karen M. Stecker, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendant J.G., the biological mother of minors M.M. and L.M., and defendant J.M., the minors' biological father, seek reversal of the final judgment of guardianship the Family Part entered on October 3, 2023, in favor of the Division of Child Protection and Permanency.[1] The judgment terminated defendants' respective parental rights after a lengthy trial. The Law Guardian for the minors joins with the Division in opposing the appeals.

---

[1] We use initials and fictitious names from the briefs in our opinion to protect the parties' privacy and because records relating to proceedings held under Rule 5:12 are excluded from public access under Rule 1:38 3(d)(12).

For the reasons that follow, we affirm the order terminating defendants' parental rights and enabling the adoption of the children by their resource parents, substantially for the reasons the trial court detailed in the comprehensive opinion it placed on the record. The court reasonably determined the Division had met its burden of proving, by clear and convincing evidence, all four prongs of the statutory criteria for termination under N.J.S.A. 30:4C-15.1(a). We are not persuaded by defendants' arguments, including their focused arguments as to the third and fourth prongs, to the contrary.

I.

Given that the parties are well familiar with the extensive factual and procedural background of this matter, and the record of the eleven-day trial, we need not detail that background in this opinion. The following abbreviated summary will suffice.

M.M. (Mary) was born in April 2018. L.M. (Leo) was born in February 2019. Defendants J.G. (the mother) and J.M. (the father) are separated co-parents who never married one another. The mother has an older child who does not reside with her. The father has other children who do not reside with him.

On June 9, 2021, based on a report of drug use in the presence of children, the Mansfield Township Police Department responded to a motel room where

the mother was staying with the children. The mother opened the door to the room and denied anyone else was in the room with her other than the two children. The police found the children playing in the bathtub and discovered the father naked behind the shower curtain. Inside the motel room, the police observed on one of the beds a glass pipe with burnt residue, which the father later described as a "meth pipe"; an "MDMA ecstasy-type pill"; and wax folds containing a substance the father later admitted was heroin. All of those items were within the reach of the children. The police also found an open knife on a shelf near the bathtub. The police arrested defendants for outstanding warrants and drug possession. The Division placed Mary and Leo with D.G. (Doug), who is the mother's brother, and his fiancée, S.H. (Sophie). The children have continued to live with Doug and Sophie, who became their resource parents.

Following her arrest, the mother completed a substance-abuse evaluation and was recommended for intensive outpatient treatment. She submitted to drug testing on June 24, 2021, and tested positive for methamphetamines. She attended an intake appointment at a substance-abuse treatment facility on July 28, 2021, and tested positive for methamphetamine and amphetamine. She subsequently tested negative throughout August 2021 and on September 1, 2021, but then started attending late or failing to attend treatment sessions in

4

September and failed to submit to urine screens. In October 2021 she was discharged from the substance-abuse treatment facility for failure to complete the program. She subsequently had multiple failed attempts with other treatment programs and repeatedly did not show up to appointments, failed to respond to requests for or provide urine samples, and refused to schedule follow-up appointments with resources provided by the Division.

Following his incarceration after the June 2021 motel-room incident, the father attended a detox program and a short-term residential program at a substance-abuse treatment facility but declined after-care treatment at the facility. In October 2021, he was incarcerated in a county correctional facility. After he was released from that facility, he entered an inpatient substance-abuse treatment facility in January 2022. According to a May 5, 2022 order, the father was "engaged in substance abuse treatment and testing negative" and "is also working" but "still needs to obtain housing . . ." while the mother was "not addressing her substance abuse issues." In June 2022, the father tested positive for THC while in Recovery Court and was placed in a halfway house. In September 2022, the Division learned the father was incarcerated again. During the time of his incarceration, he refused to speak with the Division caseworker.

A-0551-23

He was subsequently released and then incarcerated again in January 2023, where he remained throughout the duration of the trial of this case.

In addition to participating in substance-abuse treatment programs, the court ordered defendants to obtain stable housing and employment. Division caseworkers attempted to assist defendants in finding stable and secure housing through various programs, but defendants failed to secure that housing. In addition, although they occasionally had jobs for limited periods of time, neither parent was able to obtain secure and stable employment throughout the Division's involvement.

On September 12, 2022, the Division filed an order to show cause application and a verified complaint seeking the termination of defendants' parental rights. At the trial, the Division called as witnesses Division caseworkers, a police detective who had responded to the motel room on June 9, 2021, and an expert witness in psychology, parental fitness, and bonding.

The caseworkers testified about the numerous substance-abuse treatment referrals the Division had made for defendants, defendants' failure to address successfully their substance-abuse issues, the Division's efforts to assist defendants in finding stable housing and employment, their discussions with the resource parents about kinship legal guardianship (KLG) and adoption, and the

6

resource parents' rejection of KLG and expressed commitment to adopt the children.

The Division's expert witness described the psychological evaluation she had conducted of the mother and the bonding evaluations she had performed concerning the children and the mother, as well as the children and the resource parents. She was not able to complete an evaluation of the father. A Division caseworker testified she had attempted to schedule an evaluation of the father for trial purposes. The father, however, declined to speak with her when he was incarcerated and did not provide information about how or where he could be contacted when he was not incarcerated.

The Division's expert witness described the mother's "capacity to parent" as being "significantly impaired" and raised concerns regarding the mother's persistent denial of any substance-abuse history and lack of a plan to obtain housing, employment, or care for the children. She concluded that although the children shared a bond with her, the mother was not "someone who was going to make the type of corrections that would be needed to parent the children now or in the future." She also explained why she believed the resource parents were capable caregivers who had bonded with the children, why terminating parental rights would not cause more harm than good and was in the children's best

interest, and why any harm to the children from being separated from the mother would "be adequately mitigated because they are in a stable environment, and they identify with their resource parents as psychological parents."

The Law Guardian joined with the Division and in supporting termination of defendants' parental rights and presented the testimony of an expert witness in clinical and forensic psychology, parental fitness, and bonding. That expert witness described the evaluations he had performed and explained why he did not believe the mother was fit to parent the children, why he believed the children's stability and protection were at risk of harm if they were left in her care, why the resource parents were capable and bonded caregivers, and why terminating parental rights would not cause more harm than good.

Both resource parents testified. The Division called Doug as a witness. Doug testified he had a good understanding of KLG, the Division had adequately explained KLG and adoption, and he and Sophie had chosen to pursue adoption. He also stated he would be willing to allow the mother and father to have contact with the children even after the adoption as long as they were "doing what they need to do and [got] back to healthy living in society." After stating he had never agreed to participate in KLG and explaining why he wanted to adopt the children, Doug testified in response to a question posed on cross-examination

that if the court did not terminate the parental rights, he would not demand that the children be removed from his care.

> Q. . . . [I]f the Court were not to terminate [defendants'] parental rights, are you going to ask for the children to be removed from your care?
>
> A. No, that's insanity. I'll never ask for them to be removed from my care, unless, of course, mom and dad are fit in the future. Outside of that –
>
> . . . .
>
> A. Mom and dad are fit in the future, they start doing what they have to do, that's something we can approach, three, four, five, ten, whatever it takes, down the line, okay? But for right now, best course of action is adoption.

The father called Sophie as a witness. She testified she understood the differences between KLG and adoption and that the options had been adequately explained and presented to them. She stated she wanted to adopt the children, explaining adoption more closely aligned with how they viewed their family functioning in the future. Like Doug, Sophie also testified that if the court did not terminate defendants' parental rights, she would not ask for the children to be removed from her care.

Defendants did not testify. The mother presented the testimony of an expert witness in parental bonding who had conducted a psychological

A-0551-23

evaluation of the mother and a bonding evaluation of the mother and the children, as well as the resource parents and the children. She opined that the children were bonded with the resource parents and the mother and that preserving the bond with the mother through a KLG arrangement with the resource parents was in the children's best interest. She, however, testified that she "did not endorse [the mother] as being fit to parent now or in the foreseeable future" and did not perceive any prognosis for change "given the [mother's] longstanding substance abuse history and the noncompliance with treatment recommendations, as well as lack of housing and lack of employment." She confirmed Doug had told her he and Sophie did not want to participate in KLG and wanted to adopt the children, but she questioned his understanding of KLG.

On October 3, 2023, the trial court placed a decision on the record and entered an order finding in the Division's favor and terminating defendants' parental rights to Mary and Leo. The trial court found the mother's expert witness to be less credible than the Division's and the Law Guardian's expert witnesses. In particular, the court concluded the mother's expert witness's testimony about KLG and KLG being in the children's best interests not credible. These consolidated appeals followed.

II.

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally protected right to raise their children, absent state interference, and the State's responsibility to protect the welfare of

11

children.  N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023).  That balancing "is achieved through the best interest of the child standard."  Ibid. (quoting K.H.O., 161 N.J. at 347).  The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a).  See D.C.A., 256 N.J. at 21 (recognizing the Legislature codified "the best interests test" when it enacted N.J.S.A. 30:4C-15.1(a)).

Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a), as amended by the Legislature in 2021:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

These four prongs are "not discrete and separate" but rather "overlap to offer a full picture of the child's best interest." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

We give substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. Id. at 552. "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case[,]'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family[,]" F.M., 211 N.J. at 448. Accordingly, we defer to the trial court's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19. The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

On appeal, the mother challenges the court's findings under the third and fourth prongs of the best-interests test. The father challenges the court's findings under all four prongs, but his counsel acknowledged during oral argument before us his focus is on the third and fourth prongs.

"The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383).

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." Id. at 451 (citing K.H.O., 161 N.J. at 352;

see also <u>D.C.A.</u>, 256 N.J. at 27 (finding prong two as amended was intended "to ensure that parental fitness – not the child's bond with the resource parents – is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case").

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights."  As to the first part of prong three, the reasonableness of the Division's efforts is not conditioned upon their success.  <u>N.J. Div. of Youth & Fam. Servs. v. L.J.D.</u>, 428 N.J. Super. 451, 488 (App. Div. 2012).  The success or failure of the Division's efforts will not "foreclose a finding that the Division met its statutory burden to try to reunify the child with the family."  <u>Ibid.</u> (quoting <u>N.J. Div. of Youth & Fam. Servs. v. F.H.</u>, 389 N.J. Super 576, 620 (App. Div. 2007)).  "Experience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship."  <u>F.M.</u>, 211 N.J. at 452.  As to the second part of the third prong, the Division must prove "by clear and convincing evidence that 'alternatives to termination of parental rights' have been appropriately considered."  <u>N.J. Div. of Youth & Fam. Servs. v. J.S.</u>, 433 N.J. Super. 69, 87

(App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)).

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

As detailed in the trial court's comprehensive opinion, we agree the record contains adequate "substantial, and credible evidence" to support the trial court's decision to terminate defendants' parental rights. Id. at 19. In its extensive opinion, which need not be repeated in detail here, the trial court thoroughly addressed all four statutory factors for termination. Both parents have shown themselves under prong one to be unfit to care for the children primarily due to

their persisting issues with substance abuse and housing and employment instability.

Under prong two, the court reasonably found defendants are unlikely to remediate the factors posing a risk of harm to the children in the foreseeable future given their failures to address their substance-abuse and housing-instability and employment-instability issues. The testimony on this issue by the Division's and the Law Guardian's expert witnesses was unrebutted; even the mother's expert witness concluded the mother had no prognosis for change and was not "fit to parent now or in the foreseeable future." The father faults the court for indicating prong two could be satisfied "if the child will suffer substantially . . . from the disruption of the bond with the foster parents." See id. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a)(2) "precludes a court from considering the bond between a child and resource parents under the second prong"). The court, however, did not base its prong-two finding on any consideration of the children's bond with the resource parents but appropriately focused on defendants' demonstrated inability to eliminate the harm facing the children due to defendants' substance-abuse issues and housing and employment instability.

As to prong three, the record supports the court's detailed findings that the

17

Division reasonably provided or offered defendants many services. And defendants do not challenge that conclusion. Instead, they contend the court erred in its legal and factual conclusions as to the second part of the third prong: its obligation to consider alternatives to termination of parental rights, specifically KLG. We disagree.

The court had an ample basis under prong three to find the Division had adequately explored alternatives to termination. The caseworkers testified about the information they had provided to the resource parents about adoption and KLG. The resource parents testified at length about the information provided to them, their understanding of KLG and adoption, why they had rejected KLG, and why they wanted to adopt the children. "The decision of a resource parent to choose adoption over KLG must be an informed one." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 260 (App. Div. 2019). The testimony of the caseworkers and the resource parents, including testimony elicited during probing cross-examination, established the resource parents' decision to adopt was an informed decision. Defendants fault the Division's and the Law Guardian's expert witnesses for focusing on adoption and not giving more consideration to KLG. Given the informed decision of the resource parents in rejecting KLG and choosing adoption, we are not persuaded by defendants'

argument.

"The caregiver's consent to adopt should be not only informed, but also unconditional, unambiguous, and unqualified." Id. at 264. The resource parents' testimony also demonstrated that their consent to adopt was "unconditional, unambiguous, and unqualified." Ibid. Defendants focus on Doug's and Sophie's response to a question posed to them during cross-examination about whether they would demand the children be removed from their care if the court did not terminate defendants' parental rights. Their response to that question – that they wouldn't demand the children be removed from their care – was not proof of any ambiguity or lack of commitment to adoption; it was proof of Doug's and Sophie's commitment to the children.

Lastly, as to the fourth prong, the trial court did not abuse its discretion in finding that termination of defendants' parental rights would not do more harm than good and that any harm would be lessened by the positive relationship the children have with the resource parents. The court made that finding based on the credible testimony presented, including the testimony of the Division's and the Law Guardian's expert witnesses that termination would not cause the children more harm than good. The court did not err in giving substantial weight to the children's need for permanency, having been in an uncertain status since

their removal in 2021. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007).

To the extent we have not addressed other arguments raised by defendants, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION