# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2710-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.S.,

     Defendant,

and

D.J.,[1]

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.S.,
a minor.

_____

---

[1] We employ initials and pseudonyms to identify the parties, child, and others to protect the child's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

Submitted January 22, 2025 – Decided January 31, 2025

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0016-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Deric Wu, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Lakshmi R. Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor, N.S. (Meredith Alexis Pollack, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant D.J. (Dave) appeals from the Family Part's April 19, 2024 judgment terminating his parental rights to his daughter, N.S. (Nina), and granting guardianship to the New Jersey Division of Child Protection and Permanency (Division) with the permanency plan that her resource parent, L.C. (Linda) adopt Nina. Dave argues the trial judge erroneously found the Division had proven by clear and convincing evidence all four prongs of the best interests test warranting termination of his parental rights under N.J.S.A.

30:4C-15.1(a). The Law Guardian argues the judge correctly found the Division had proven the best interest prongs to terminate Dave's parental rights and that the judgment should be affirmed. Having reviewed the record, the parties' contentions, and the applicable law, we affirm the judgment because the judge correctly applied the law, and substantial credible evidence supports her findings.

I.

We summarize the pertinent facts established during the guardianship proceeding. Following a seven-day trial, the judge terminated Dave's and J.S.'s (Jan)[2] parental rights to Nina.

Dave and Jan dated and are Nina's biological parents. In June 2021, Jan delivered Nina in Georgia. Dave and Jan had moved to Georgia three days before Nina was born. Jan was nineteen years old at the time, and Dave was twenty-one years old. The Division had provided Jan services since she was fifteen years old. The Division had removed Jan from her mother's care after learning her maternal grandmother and aunt were abusing her. Jan was later adopted.

---

[2] Jan did not appeal the termination of her parental rights to Nina.

During the Division's guardianship trial, the Law Guardian, appearing for Nina, supported termination of Dave's and Jan's parental rights. At trial, the Division adoption caseworker, the Division caseworker, Alan J. Lee, Psy. D., James L. Loving, Psy. D., Dave, and Jan testified.

The caseworker had known Jan since November 2017 when the Division first became involved with Jan as an adolescent. The caseworker testified about her original interaction with Jan and later involvement with both parents in 2020. The adoption caseworker recalled that her involvement with the parents began in May 2023, and the Division assigned her to the records in this matter.

In September 2020, Jan contacted her caseworker. Jan reported that she was at an unknown location in New Jersey, Dave had assaulted her, and she was scared. The caseworker advised Jan to seek help and call the police. Jan reported her nose was possibly broken, and she had a black eye. She believed Dave was following her, and she did not feel safe. After the hospital admitted Jan for injuries, the medical discharge paperwork indicated she had a superficial head injury, foot contusion, and abrasion. Jan later explained to the caseworker that she was in a vehicle with Dave, and he was hitting her so hard that she jumped out of the moving car and sustained injuries. At the time, Jan

4

was residing at Dalton House, a residential placement facility, but had left to see Dave. Jan revealed to her caseworker that Dave had been hitting her and was aggressive toward her.

On October 30, Dave went to Dalton House to see Jan because she allegedly took his money. A Dalton House employee heard Dave and Jan having an argument. Dave threw Jan's cell phone from his vehicle, breaking it and causing Jan distress. Two days later, there was another incident between them. Shortly thereafter, Jan advised the Division she was pregnant, and Dave was the father.

In November, the Division helped Jan move to a new residential facility, Capable Adolescent Mothers. In December, Jan advised her caseworker that Dave kicked her in the stomach and punched her in the nose. Jan did not want to obtain a temporary restraining order (TRO). In January 2021, the Division learned Jan left the facility to meet Dave and later returned with blood stains on her robe and slippers. She appeared upset and reported to a facility worker that Dave had threatened to harm her, and the blood on her was likely caused from jumping out a second-story window. She again refused to apply for a TRO.

A-2710-23

On March 11, police arrested Dave for aggravated assault against Jan. The Division was notified Dave had again physically abused Jan, resulting in her being taken to the hospital. Jan did not want a TRO. As Dave was charged with two indictable domestic violence offenses, the criminal court ordered him to have no contact with Jan, noting she was "pregnant" and that the "risk of danger [wa]s high." In April, the Division helped Jan move to the Center for Great Expectations, but the facility dismissed her for not timely returning. She again changed facilities when Covenant House provided her a residence. Jan had developed a history of running away to see Dave.

In May, the Division transferred Jan to Raphael's Life House. On June 10, the caseworker met with Jan and inquired about a laceration on her head. Jan told the caseworker she had fallen. The caseworker informed Jan that a hospital had contacted the Division based on concerns that Dave had assaulted her.

In mid-June, Jan and Dave moved in with his mother, L.J. (Liz), in Willingboro. On June 15, after a substitute caseworker contacted Dave's mother, she merged the phone call to include Dave, but when the substitute caseworker advised Dave that further domestic violence would likely result in the removal of his child after she was born, the call was dropped. The

6

substitute caseworker contemporaneously attempted several more times to reach Dave, to no avail. Thereafter, the substitute caseworker and her supervisor went to Liz's residence but were unsuccessful in meeting with Jan and Dave. After the substitute caseworker reached Liz telephonically, Liz refused to be the primary caretaker of Dave's unborn child.

On June 23, Jan advised the caseworker she was in Georgia, had given birth to Nina, and was staying with Dave at his brother's home. The Division contacted Georgia's Child Protective Services (CPS), relaying concerns about Jan and Nina due to Dave's domestic violence and homelessness concerns. In July, CPS notified the Division it was closing its case because Nina was doing well.

On August 2, the Division received an anonymous referral from someone Jan and Dave lived with in Georgia and who knew Dave's family because the person was concerned for Nina's welfare. The referent reported that she asked Nina's parents to leave after observing multiple domestic violence incidents, marijuana usage, and alcohol consumption. The referent expressed concern for Nina's safety because the police were called approximately eight times due to domestic violence between the parents. During one incident, the referent stated she personally observed Dave push Jan

A-2710-23

on top of Nina, placing the newborn in danger of potentially life-threating injuries. Thereafter, the family left for Newark in mid-July to stay with Dave's mother, Liz.

The same day the Division received the referral, Division workers went to Liz's home to check on Nina and met with Jan and Dave. The workers observed Liz's home in disarray. Jan was sucking on Nina's pacifier and did not want to leave with the Division workers. Dave admitted he was on probation for breaking and entering, but he denied knowledge of the criminal court order that prohibited his contact with Jan pursuant to his pending domestic violence charges. The workers persuaded Jan to leave, but she became upset in the process and threatened to run away with Nina. On August 3, based on safety concerns for Nina, the Division conducted an emergency removal and placed her with a maternal cousin, L.C. (Linda).

On August 5, after a post-removal hearing, the Family Part judge returned custody of Nina to both parents under the conditions of a safety plan and Liz's constant supervision. The judge ordered Dave and Jan to attend: parenting classes; domestic violence counseling; psychological evaluations; and other recommended services. The judge also ordered Dave to submit to a domestic violence assessment and restrained Dave from going to the home.

Shortly thereafter, Liz asked the Division to place Jan and Nina elsewhere due to acrimony, but she withdrew the request after reconciling with Jan. On September 9, Liz informed the Division that Dave was with Jan in violation of the criminal court's no-contact order and the Family Part judge's order restraining Dave from Liz's residence. In response, the Division visited Liz's home, and she confirmed Dave was frequently there and regularly fought with Jan. Liz showed the caseworker a video of Dave shoving Jan during an argument. The Division determined another removal of Nina was warranted for her safety, but Jan had run away with the child. Jan later contacted the Division and reported she was staying in a hotel with Dave.

The Division conducted a second removal on September 10. During the removal, the caseworker observed that Nina was dirty and smelled badly. At the time, Nina was two-and-a-half months old, and the Division again placed her with Linda as the resource parent. On September 14, the judge granted the Division's application for custody of Nina due to concerns for her welfare. The judge ordered Dave and Jan to have supervised two-hour visits with Nina twice a week. Although the Division provided Dave transportation to and from the visits to facilitate his attendance, Dave missed nearly three months of scheduled visitations with Nina because "he did not want to add further trauma

9

to [Nina]."  The judge issued orders extending the Division's reunification plan to provide the parents further services and time.

On February 26, 2023, Dave and Jan were arrested for a physical altercation.  Jan reported to police that Dave choked her until she bit him.

On March 17, Dave entered a negotiated plea with the State on one count of third-degree aggravated assault for domestic violence against Jan on February 26, 2023 and for a violation of his probation.  The criminal court thereafter sentenced Dave in accordance with a negotiated plea agreement to a time served custodial period of ninety-days and four years' probation.  Dave had been incarcerated from February 26 to May 26 and did not visit Nina in person during this period.

In April 2023, Nina required a myringotomy surgery to improve her speech and hearing.  Linda ensured Nina received the procedure and was cared for.  Nina also was diagnosed with developmental issues and asthma.

On June 14, the Division filed a complaint seeking guardianship of Nina. After the Division's second removal of Nina, multiple domestic violence incidents occurred between Dave and Jan.

The Division proposed that Jan have overnight visits with Nina, but the visits never transpired because she ran away from her placement facility.  The

10

judge offered Dave the opportunity to schedule a third visit each week with Nina if he could provide his own transportation, but he declined. On December 2, Liz reported that Dave punched a hole in her residence's wall and assaulted her. Police officers attempted to arrest Dave, but he resisted arrest, fleeing on foot. Dave was charged with criminal mischief, simple assault, and resisting arrest. On December 27, the State charged Dave with third-degree eluding police, which was pending at the time of the guardianship trial. Linda advised the adoption caseworker that she was not personally willing to supervise Dave's visits with Nina due to his history.

Dave completed the Batterers Intervention Program and completed a parenting class. Dave did not regularly attend scheduled therapy. The Division continued to offer Dave therapy, but he was noncompliant and expressed concerns that his Caucasian therapist was implicitly biased against him as an African American man. After the Division offered Dave an African American therapist, he still did not fully participate and only attended approximately half of the scheduled sessions.

Dave had advised the Division he was attending college classes, but he never demonstrated attendance. He also never obtained housing or employment. Dave indicated he would reside with his mother, but the

A-2710-23

Division had concerns because Liz had previously obtained a TRO against him.

The Division's clinical and forensic psychology expert Dr. Lee testified to having significant concerns about Dave's ability to serve as an independent caretaker for Nina. Dr. Lee opined that he did not support, at the time nor in the foreseeable future, reunification of Dave and Nina. He had conducted a multi-method assessment of Dave. Dr. Lee explained that after completing Dave's evaluation, he determined Dave was unable to perform as an acceptably functioning parent for Nina because of his: domestic violence history and propensities; residential instability and homelessness; lack of employment; poor knowledge of parenting; criminal history; and inability to provide a stable home environment. Because Dave generally denied a history of anger management problems, Dr. Lee opined he would maintain a propensity for violence, which placed Nina at risk of harm. Specifically, he opined that Dave's steadfast belief that he had no significant issues with domestic violence placed Nina at risk of both physical and emotional harm.

Dr. Lee also performed a bonding evaluation of Dave and Nina. He concluded Nina had an ambivalent attachment to Dave but found there was no significant psychological attachment. As such, Dr. Lee found Nina would

12

suffer a low risk of harm from termination. Based on the combination of these concerns and Nina's total inability to care for herself, Dr. Lee opined Dave could not consistently provide as a parent for Nina in the foreseeable future. Therefore, he recommended Linda's adoption of Nina under the Division's permanency plan because of her strong attachment.

The Law Guardian's clinical and forensic psychology expert, Dr. Loving, testified that after evaluating Dave, he found him to be untruthful. Dr. Loving opined that Dave still presented as a very high-risk of committing domestic violence against Jan. He testified that Dave admitted to committing some of the alleged acts of domestic violence but blamed Jan. Dr. Loving opined that both parents posed a serious risk to Nina, and he believed Linda's adoption of Nina was in the child's best interest.

After law enforcement arrested Dave at the courthouse on an outstanding warrant, he later testified during the guardianship trial. He stated he had future plans to get a job and to find housing with a voucher he had received. Dave maintained he had learned from his mistakes and sought reunification with Nina. He testified to making progress in therapy. Dave did not explain his inability to secure safe and stable housing for Nina or failure to find employment during the months Nina's guardianship matter was pending. The

A-2710-23

judge found his answers were "flimsy" and found he lacked credibility. She noted that during the trial, Dave would "sleep at times," and he did not demonstrate a "good demeanor."

Jan, who was pregnant, testified that she wished to parent Nina and believed she had the ability. She conceded to recently text messaging Dave during the trial. Jan acknowledged her domestic violence history with Dave. She testified that he had previously: punched her, kicked her in the stomach while pregnant with Nina, broke her phone, and struck her with his car. She explained they would physically fight. Regarding harm to Nina, Jan asserted she warned Dave that his violence toward her could hurt Nina. She believed that Dave could kill her. The judge found Jan was "mostly honest" and had candidly relayed her limited capability to parent Nina on her own. Further, the judge found Jan honestly explained the domestic violence between her and Dave.

Regarding alternative placement and kinship legal guardianship (KLG), the adoption caseworker testified the Division had contacted Jan's three biological sisters, mother, and adoptive mother, but Jan's contacted relatives were unable to care for Nina. The Division also contacted Dave's mother and aunt, but they were unable to care for Nina. The Division also investigated

14

other family members for KLG. Nina's paternal great-grandmother had applied for custody but withdrew the application during the guardianship trial.

At the time of trial, Nina had been in Linda's care for approximately two-and-a-half years. The adoption caseworker testified to informing Linda three or four times about KLG, but she declined KLG because she was solely interested in adopting Nina. At the time of trial, Nina was almost three years old. After conducting a bonding evaluation between Linda and Nina, Dr. Lee determined they had a significant psychological attachment, and Nina would suffer harm if the permanency ended. Dr. Loving also performed a bonding evaluation of Linda and Nina. Similarly, he recommended Linda adopt Nina because his bonding evaluation indicated a strong attachment. He opined that Nina saw Linda as a parental figure and that there was a high risk of harm to Nina if "[Nina] were to be removed from [Linda]." The judge found Dr. Lee and Dr. Loving very credible.

On April 19, 2024, the judge issued an order accompanied by a comprehensive approximately eighty-page oral decision granting the Division termination of Dave's and Jan's parental rights to Nina. She found the Division had satisfied by clear and convincing evidence the four best interest factors under N.J.S.A. 30:4C-15.1(a)(1) to (4). The judge delivered extensive factual

15

findings and legal conclusion in support of termination of Dave's parental right

to Nina, stating in part:

> Both parents have been unable to provide day-to-day nurturing for [Nina] since her second removal. As far back as June 2021, [Jan] and [Dave] each stated that they would get an apartment. Now, almost three years later, neither has stable housing, neither has history of steady employment. Neither had a clear thought-out plan for how they would care for [Nina] and provide her with a safe and loving home.
>
> [Nina] was removed August 2021 and then, again, September 2021 for the second and final time. Despite this extended amount of time in the immediacy at which [Nina] needs a loving and stable home, neither parent has been able to provide that for [Nina]. Both parents have an unabated domestic violence and volatility issues.
>
> The reported domestic violence between the two parents is extensive and includes an allegation that [Jan] was kicked by [Dave] while she was pregnant with [Nina]. This shows that the domestic violence between the two has been affecting [Nina] before she was even born and continued after birth and is highly likely to continue today.
>
> Both parents repeatedly violated their no-contact order repeatedly throughout their relationship and [Nina's] life. They repeatedly violated their safety protection plan in between the first removal and the second removal. There was an allegation that during a physical fight they both rolled on top of [Nina].
>
> . . . .

16

. . . [Dave] ha[s] never taken any substantial steps in order to eliminate the harm that faces [Nina]. There has been ample evidence of [Dave's] . . . parental dereliction and irresponsibility. The lack of effort which -- with the Division's services, at the lack of stable housing from either defendant, the lack of employment from either defendant, the inconsistency at times of [Nina's] visitations and how, both, [Jan] and [Dave] have not taken responsibility or appropriate steps to remedy their domestic violence incidents.

. . . .

. . . [Dave], specifically, has never taken accountability for the violence he committed against . . . [Jan]. He has denied taking responsibility with multiple doctors over the course of years. Even in court, he did not take responsibility.

The Division also pointed to [Dave's] criminal history contained within [the record,] which contains a guilty plea in June . . . 2023 . . . to aggravated assault for domestic violence as against [Jan] for four years' probation as well as a recent charge of eluding on December 27, 2023 and a violation of probation. And the Division appoints to these as cause for concern.

. . . .

Further regarding [Dave], Dr. Loving was clear that [his] pattern of aggressive behavior will continue to pose risks to [Nina] which are evidenced in his existing problems of, number one, lack of stable housing; two, legal and criminal issues; three, lack of awareness of his need for therapy; four, lack of knowledge of parenting.

On appeal, Dave raises the following arguments: (1) there was no evidence that he ever harmed Nina or presented as a source of harm, especially after he ended his relationship with Jan; (2) he demonstrated that he was willing and capable of addressing the Division's concerns of harm; and (3) the judge had a duty to consider KLG in a meaningful way under both the best interests test and the KLG Act.[3]

## II.

We review a trial court's decision to terminate parental rights with deference when its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they

---

[3] N.J.S.A. 3B:12A-1 to -7.

are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447 (italicization omitted). In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect

19

children from harm.  See N.J. Div. of Child Prot. & Permanency v. R.L.M.,

236 N.J. 123, 145 (2018).

When terminating parental rights, the trial court applies the statutory

best interests test, which requires the Division to prove four prongs:

> (1) The child's safety, health, or development has been
> or will continue to be endangered by the parental
> relationship;
>
> (2) The parent is unwilling or unable to eliminate the
> harm facing the child or is unable or unwilling to
> provide a safe and stable home for the child and the
> delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to
> provide services to help the parent correct the
> circumstances which led to the child's placement
> outside the home and the court has considered
> alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more
> harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence."

N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App.

Div. 2021).  These prongs are not separate and overlap to inform a more

general inquiry that the termination of parental rights is in a child's best

interests.  R.L.M., 236 N.J. at 145.  "The question ultimately is not whether a

biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "[P]arental fitness is the key to determining the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

In 2021, the Legislature amended Title 30, which governs guardianship proceedings and contains the best interests standard, and Title 3B, which concerns KLG proceedings. L. 2021, c. 154. The Legislature amended only prong two of the best interests standard under N.J.S.A. 30:4C-15.1(a) by deleting the sentence, "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." Compare L. 2021, c. 154, § 9 (current N.J.S.A. 30:4C-15.1(a)(2)), with L. 2015, c. 82, § 3 (prior version). The amendment did not preclude a court's consideration of a child's bond to a resource parent under prong four. The Supreme Court elucidated that "[t]he Legislature acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess

21

parental fitness under the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry." D.C.A., 256 N.J. at 26 (citing L. 2021, c. 154). To foreclose a child's bond with their resource parents from consideration "would deprive a court of crucial information as it determines a child's future, and could imperil children whom New Jersey is charged to protect." Id. at 27-28.

As to Title 3B, N.J.S.A. 3B:12A-1 to -7, the Legislature removed the requirement that courts find "adoption of the child is neither feasible nor likely" before appointing a caregiver as a KLG. Compare L. 2021, c. 154, § 4 (current N.J.S.A. 3B:12A-6(d)(3)), with L. 2006, c. 47, § 32 (prior version). As amended, the KLG Act ensures that a resource parent's willingness to adopt no longer forecloses KLG. See N.J.S.A. 3B:12A-6(d)(3) (stating "the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary"). However, "awarding kinship legal guardianship" must still be "in the child's best interests." N.J.S.A. 3B:12A-6(d)(4).

A.

The Division, under prong one of N.J.S.A. 30:4C-15.1(a), must prove by clear and convincing evidence "the child's safety, health, or development has

been or will continue to be endangered by the parental relationship." "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). "Although a particularly egregious single harm" can suffice, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Dave contends the judge erred in finding the Division satisfied prong one of best interests test because he never harmed Nina and did not present as a source of potential future harm to her. A review of the record establishes, as Dr. Lee opined, that Dave placed Nina at risk of physical and emotional harm. The judge found Jan honestly testified that Dave kicked her in the stomach while pregnant with Nina and committed other acts of domestic violence against her. In addition to placing an unborn Nina at risk of physical harm, Dave placed Nina at risk of emotional harm once she was born by subjecting her to a toxic, violent environment. Notably, in March 2023, it is undisputed Dave pleaded guilty to committing aggravated assault against Jan, which resulted in his serving time in jail and receiving four years of probation. Further, he consistently violated the criminal no-contact order by seeing and

communicating with Jan and the family judge's safety plan order restricting his presence from Liz's residence while Nina resided there. The record amply supports the judge's finding that his domestic violence against Jan "affect[ed]" Nina and was "highly likely to continue."

We reject Dave's argument that the Division did not meet its burden under the best interests test's first prong because it produced "no evidence [Nina] was ever exposed to domestic violence." We recognize that "children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 13, 25 (App. Div. 2016) (quoting N.J.S.A. 2C:25-18). Further, his argument that "there is no evidence domestic violence has harmed or will harm" Nina is belied by the record. We concur with the judge's finding that Nina's infancy did not alleviate her exposure and potential harm from the multiple domestic violence incidents. Nina had to be removed from Dave's and Jan's custody on two occasions for her safety. We note that in addition to the continued occurrences of domestic violence between Dave and Jan, at the time of the second removal, Dave had not secured steady housing, was not steadily employed, and had pending criminal charges. As the judge noted, during the second removal, case workers

24

found Nina was dirty, smelled, and was without sufficient necessities. We discern no reason to disturb the judge's well-reasoned findings under prong one.

B.

Pursuant to prong two, the Division must demonstrate that the parent "is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The Division may seek termination when there are "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home." K.H.O., 161 N.J. at 353. Because the first two prongs are closely intertwined, "evidence that supports one [prong] informs and may support the other as part of the comprehensive basis for determining the best interests of the child." N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)).

Dave contends the judge's "findings were generic" and lacked specificity. A review of the judge's opinion contradicts this assertion. The judge found witnesses credibly established that Dave: never found steady

25

employment; could not provide safe and stable housing; posed a risk of committing future domestic violence against Jan and had anger management issues, which placed Nina at risk; and lacked parenting skills. The record substantially supports the judge's findings.

Dave's contention that he demonstrated he had adequate and stable housing to live with Nina is unsupported. He argues his mother notified the Division that Dave and Nina could "live with her." As the judge recognized, Liz had previously obtained a TRO against Dave. Also, during the guardianship proceedings, she called the police alleging Dave assaulted her and punched a hole in a wall in her home. Therefore, his assertion that he could have resided safely with Nina at his mother's residence is without merit. Further, during the guardianship action Dave testified to having received a housing voucher, but he did not obtain a residence. As Dave failed to provide a safe environment for Nina to live in, the Division established Dave was unwilling to address concerns of harm.

We also note that Dave's psychological evaluations revealed he does not recognize his aggressive behavior and acts of domestic violence against Jan created potential harm to Nina. Attempting to justify his actions, he blamed Jan. While Dave did attend therapy sessions and completed separate parenting

 A-2710-23

and domestic violence courses, attendance alone does not equate to addressing and eliminating behavioral issues, which clearly created a risk of harm to Nina. Also, the experts observed Dave's inability to consistently parent Nina. While Dave was incarcerated for over three months on the aggravated assault against Jan and his violation of probation, he could not visit Nina in person. At the time of the trial, he had an indictable pending charge for eluding. The record amply supports the judge's finding that Dave was "unwilling and unable to eliminate the harm facing" Nina, because he had "never taken any substantial steps in order to eliminate the harm that face[d] [her]."

Further, we reject Dave's assertion that it was sufficient that he demonstrated a receptiveness and willingness to address the concerns of harm to Nina and to provide a future safe and stable home for her. We have recognized children's interests must also be balanced and that "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018). "Children have their own rights, including the right to a permanent, safe[,] and stable placement." C.S., 367 N.J. Super. at 111. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of

27

reuniting with the child." Ibid. For these reasons, we discern no error in the judge's cogent and thorough findings that the Division proved prong two by clear and convincing evidence.

C.

Prong three of the best interests test requires the Division to have "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court [must have] considered alternatives to termination of parental rights."[4] N.J.S.A. 30:4C-15.1(a)(3). The KLG Act was enacted "to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights." N.J.S.A. 3B:12A-1(c). The 2021 amendments made KLG equal to adoption in terms of providing permanency to children. L. 2021, c. 154 § 4; see also N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 26-28 (App. Div. 2022), aff'd, 256 N.J. 4 (2023).

---

[4] On appeal, Dave does not challenge: prong three's initial requirement that the Division "made reasonable efforts to provide services to help . . . [him] correct the circumstances which led to . . . [Nina's] placement"; and prong four's requirement that termination of his parental rights to Nina "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(3) to (4).

"The Division has a statutory obligation to contact relatives of a child in its custody." N.J. Div. of Youth and Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 576 (App. Div. 2011). It must establish by clear and convincing evidence "its exploration of alternatives to termination of parental rights." D.C.A., 256 N.J. at 29. N.J.S.A. 30:4C-12.1(a) mandates that the Division search for "suitable relative[s] or person[s] who ha[ve] a kinship relationship . . . willing and able to provide the care and support" the child requires and contemplate placement of a child in its custody with those individuals within thirty days of its "acceptance of the child in its care or custody." The Division must notify unqualified individuals in writing with the reasons they are "unwilling or unable to assume the care of the child" and their "right to seek review." N.J.S.A. 30:4C-12.1(b)(1), (4). Further, the Division "may decide to pursue the termination of parental rights if the department determines that termination of parental rights is in the child's best interests." N.J.S.A. 30:4C-12.1(c).

The judge credited the adoption caseworker's testimony concerning the Division's investigation of several relatives regarding KLG. Specifically, the judge found the Division had provided "rule-out letters" to the seven individuals it contacted and considered for alternative placement of Nina. The judge's decision referenced the adoption caseworker's credited testimony and

evidence admitted regarding the family members the Division considered, as evidenced by the Division's letters sent to the individuals considered for KLG.

Substantial credible evidence in the record supports the judge's finding that the Division thoroughly explored alternatives to termination of Dave's parental rights and explained to Linda the distinction between KLG and adoption. E.P., 196 N.J. at 104 ("We will not disturb the [judge's] decision to terminate parental rights when there is substantial credible evidence in the record to support the [judge's] findings"). The judge found the adoption caseworker's credible testimony showed that she explained to Linda the differences between adoption and KLG on three or four occasion. The adoption caseworker relayed that Linda understood the distinctions but was not open to KLG because she wanted to adopt Nina. The judge's determination that the Division complied with the KLG Act and the second part of the best interests test's third prong by investigating any available family members referred for possible KLG is sufficiently supported.

Finally, as the judge emphasized, it was reasonable for Linda to want to adopt Nina, as opposed to KLG, because she had been Nina's primary caretaker for over two and a half years. Linda had unwaveringly cared for Nina's multiple medical issues and had developed a strong parental type of

30

bond. Dr. Lee's testimony corroborated that Linda was committed to adopting Nina and that breaking their bond would be harmful to Nina. Dr. Lee specifically testified that during their bonding evaluation, Linda stated she wanted to adopt Nina if she was legally free to do so and expressed an openness to providing Nina's parents the ability to have future contact with Nina. For these reasons, we are unpersuaded by Dave's contention that the judge "simply accepted DCPP's assurances" the adoption caseworker had informed Linda about KLG. We discern no reason to disturb the judge's sufficient best interest test findings under prong three.

To the extent that we have not otherwise addressed any of Dave's arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2710-23